# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS
## KANSAS CITY DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CENTENNIAL PARK, LLC, | ) | Case No. 11-22026-11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

# DEBTOR'S DISCLOSURE STATEMENT TO
## LIQUIDATING CHAPTER 11 PLAN
### (July 4, 2011)

Christopher J. Redmond #07307
John J. Cruciani #16883
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, Missouri 64112
(816) 983-8000; FAX (816) 983-8080
christopher.redmond@huschblackwell.com
john.cruciani@huschblackwell.com

*Attorneys for Debtor*

# I.
## INTRODUCTION

On July 4, 2011, Centennial Park, L.L.C. (the "Debtor") filed a voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Bankruptcy Code ("Bankruptcy Code") (Debtor-In-Possession in Case No. 11-22026-11, with the United States Bankruptcy Court for the District of Kansas, Kansas City Division). On July 4, 2011, the Debtor filed a Chapter 11 Liquidating Plan (the "Plan"). The Plan specifies the classes of Debtor's creditors and interest holders, and the proposed treatment of such claims and interests. A copy of the Plan is attached as **Exhibit A** to this Disclosure Statement ("Disclosure Statement"). Pursuant to Section 1125 of the Bankruptcy Code, Debtor is soliciting acceptance of the Plan by the classes that are entitled to vote on the Plan. The purpose of this Disclosure Statement is to provide holders of claims against the Debtor with adequate information about the Debtor and the Plan in order to enable holders of such claims to arrive at a reasonable, informed decision in exercising the right to vote for acceptance or rejection of the Plan.

THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN AND ALL OTHER EXHIBITS, SHOULD BE READ IN ITS ENTIRETY. THIS DISCLOSURE STATEMENT CONTAINS DISCUSSION OF THE TERMS, CONDITIONS, AND PROVISIONS OF THE PLAN, AND, TO THE DEGREE THAT SUCH DESCRIPTIONS MAY DIFFER FROM, OR CONTRADICT THE TERMS, CONDITIONS, OR PROVISIONS OF THE PLAN; THE PLAN SHALL GOVERN. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED A RECOMMENDATION AS TO THE MERITS OF THE PLAN.

Creditors and interest holders should analyze the information supplied to determine whether it would be in their best interest to accept the Plan, or to reject it. In making this determination, creditors should take note of the importance of actually voting to accept or reject the Plan, because the Bankruptcy Court authorizes the Debtor to confirm a Chapter 11 Plan if it is accepted by all creditors. If all classes of creditors accept the Plan (by means of a majority

vote of the voting members of the class whose claims constitute two-thirds or more in value and more than fifty percent in number of the outstanding total claims of all the voting members of the class), then the Bankruptcy Court may confirm the Plan on a showing of the Plan's feasibility and that dissenting creditors will receive as much under the Plan as they would have received in straight liquidation under Chapter 7. If not all classes of creditors accept the Plan, the Plan may still be confirmed. At least one actually impaired class must, in any case, affirmatively vote to accept the Plan (by majority of the voting creditors whose claims total at least two-thirds in value and more than fifty percent in number of all the claims of the voting class) or else the Bankruptcy Court may not confirm the Plan. Further, creditors and interest holders are encouraged to vote because the acceptance or rejection of classes is to be determined on the basis of the voting membership of each class. A failure to vote will not be counted as a rejection of the Plan. HOWEVER, AS THE HOLDER OF A CLAIM OR INTEREST, YOUR VOTE ON THE PLAN IS MOST IMPORTANT.

NO REPRESENTATIONS CONCERNING THE DEBTOR, ITS PAST OR FUTURE BUSINESS OPERATIONS, THE VALUE OF THE DEBTOR'S PROPERTY, OR THE PLAN, ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ACCORDINGLY, NO REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN, OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT, SHOULD BE RELIED UPON IN EXERCISING THE RIGHT TO VOTE OR NOT VOTE ON ACCEPTING THE PLAN, AND ANY SUCH REPRESENTATIONS OR INDUCEMENT SHOULD BE REPORTED TO THE DEBTOR'S COUNSEL. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECTED TO AN AUDIT, UNLESS INDICATED, BUT, RATHER, HAS BEEN OBTAINED FROM RECORDS MAINTAINED BY OR UNDER THE DIRECTION OF THE DEBTOR. WHILE EVERY EFFORT HAS BEEN MADE TO BE AS ACCURATE AS POSSIBLE IN THIS DISCLOSURE STATEMENT, THE RECORDS ARE

KEPT BY OR UNDER THE DIRECTION OF THE DEBTOR ARE NOT WARRANTED NOR
REPRESENTED TO BE WITHOUT INACCURACY.

## II.
## HISTORY AND BACKGROUND OF THE DEBTOR

A. **The Debtor's Real Property**

1.        The Debtor's principal asset is real estate that consists of approximately 30
commercial lots and 35.54 acres of excess land commonly known as the Centennial Park
development project located in the Kansas City metropolitan area. The Debtor's real property
straddles Johnson County, Kansas, and Jackson County, Missouri and is comprised of: (i) real
property located in Johnson County, Kansas as described in Exhibit A-1 to the Plan (the "Kansas
Property"); (ii) real property located in Jackson County, Missouri as described in Exhibit A-2 to
the Plan (the "Missouri Property"); and (iii) excess property located in Jackson County, Missouri
and specifically described in Exhibit A-3 to the Plan (the "Excess Property" and, collectively,
with the Kansas Property and the Missouri Property, the "Real Property Collateral"). Pursuant to
a recent appraisal, dated March 7, 2011 (the "Appraisal"), the Real Property Collateral has been
valued at $8,700,000.00. A copy of the Appraisal is attached as **Exhibit A** to the Supplement to
Disclosure Statement and incorporated herein by reference.

2.        The Debtor has also obtained a 'Fair Value' appraisal of the Real Property
Collateral in the amount of $12,965,000.00. This Fair Value appraisal is consistent with the
Kansas Supreme Court's holding that in determining Fair Value in the context of state
foreclosure proceedings it is not appropriate to discount the value of the property based upon
future taxes, interest, real estate commissions, and other holding costs. See Olathe Bank v.

Mann, 255 Kan. 351, 363 (1993).  A copy of the letter setting forth the appraisal in the amount of $12,965,000.00 is attached as **Exhibit B** to the Supplement to the Disclosure Statement.

3.      The Appraisal specifically states that:

- The local area associated with the Real Property Collateral is afforded an excellent level of access, both on a regional and local basis.

- The area comprises a mix of retail development, employment centers, and multi- and single-family residential development.

- The neighborhood appears to be in the growth stage of its life cycle.

- Development activity within the neighborhood was strong until the recession in 2008, and demand for the area is likely to return, albeit at a slower rate than has been experienced in the recent past.

- Residential growth continues at a slow pace, and this should continue to fuel demand for commercial development in the area.

- Thus, based upon all pertinent factors, the economic outlook for the subject's local area is cautiously optimistic.

See Appraisal, p. 12.

4.      Pursuant to an email dated March 30, 2010, (the "March 2010 Email") from Chris Willis, the senior loan officer at FNBO, Mr. Willis advised that he estimated the value of the Real Property Collateral to be $8,850,000.00.  A copy of the March 2010 Email is attached as **Exhibit C** to the Supplement for the Disclosure Statement and incorporated herein by reference.

5.      The Debtor's remaining property is comprised of:  (i) the proceeds of settlement of suit in the amount of $323,154.53 held in Polsinelli Shughart PC's Trust Account (the "Escrow Account"), pursuant to a Joint Stipulation and Order Regarding Settlement Proceeds entered on March 25, 2011, in the Kansas State Court Action (as defined below); and (ii) any other personal property, funds or other property owned by the Debtor (collectively, with the Real Property Collateral and the Escrow Account, the "Property").

**B.     First National Bank of Omaha's Wrongful Acts Against the Debtor and Guarantors**

6.     During 2008, FNBO actively sought to increase its commercial loan presence in the Kansas City metropolitan area.  As part of its loan growth strategy, FNBO actively courted the Debtor and the Guarantors and sought to loan Debtor money so that Debtor could pay off its existing loan with Intrust Bank in full and enter into a new lender/borrower relationship with FNBO.

7.      On or about May 7, 2008, FNBO made a loan to Defendant Centennial Park and Defendant Centennial Park executed an Amended and Restated Promissory Note (the "Note") in the principal amount of $9,716,600.00 and a Construction Loan Agreement (the "CLA").  A true and correct copy of the Note and CLA are attached as **Exhibits D and E**, respectively, to the Supplement to Disclosure Statement and incorporated by reference herein.

8.     The loan from FNBO to Debtor was and is secured by a mortgage (the "Mortgage") on the Kansas portion of the Real Property Collateral and a deed of trust (the "Deed of Trust") on the Missouri portion of the Real Property Collateral.[1]

9.     The Mortgage and Deed of Trust are first and prior liens against the Real Property Collateral.

10.     The loan from FNBO to Defendant Centennial Park was and is personally guaranteed (the "Guaranty" and, collectively with the Note, CLA, Mortgage, and Deed of Trust, the "Loan Documents") by the Guarantors.  A copy of the Guaranty is attached as **Exhibit F** to the Supplement to Disclosure Statement and incorporated herein by reference.

---

[1] FNBO has filed a Petition to Reform the Deed of Trust in the Circuit Court of Jackson County, Missouri.  The Petition to Reform remains pending.

11.     When the loan was originated by FNBO, FNBO made a distribution in the amount of $485,500.00 to BP Centennial, LLC, an entity in which Dr. Vince, one of the Guarantors, owns a 50% membership interest.  See Loan Commitment Letter attached as **Exhibit G** to the Supplement to Disclosure Statement and incorporated herein by reference.  In turn, as a part of loan transaction, BP Centennial LLC put the full distribution of $485,500.00 into a certificate of deposit with FNBO (the "CD") and pledged the CD as additional collateral for the loan.  See Blocked Account Agreement attached as **Exhibit H** to the Supplement to Disclosure Statement and incorporated herein by reference.

FNBO's Misrepresentations and Misunderstandings Regarding Principal Payment Due on or Before April 10, 2010.

12.     On March 31, 2010, FNBO generated an invoice to Debtor indicating that $1,372,000.00 was due under the Note.  This amount was comprised of an erroneous $1,350,000.00 alleged default and $23,148.42 of interest.  A copy of the March 30, 2010 billing statement is attached as **Exhibit I** to the Supplement to Disclosure Statement.  At all times prior to the alleged default, the balance outstanding under the Loan Documents was for less than the maximum $9.7 million availability.  Accordingly, the loan to value ratio at all times prior to the alleged default was lower than FNBO anticipated when it entered into the Loan Documents.

13.     Before the May 17, 2010, Default Letter (as defined below) was sent to the Debtor and Guarantors, FNBO had received $1,340,650.80, leaving a nominal balance due of $9,349.20.

14.     On May 17, 2010, David V. Kenner, attorney for FNBO, on its behalf, wrote a letter (the "Default Letter") to the Debtor stating that Debtor was required to pay an additional $1,350,000.00 by April 10, 2010, that the payment had not been paid and was therefore delinquent.  A copy of the Default Letter is attached as **Exhibit J** to the Supplement to

Disclosure Statement and incorporated herein by reference. The Default Letter then states: "Accordingly, Lender has the right to accelerate the Loan without further notice to you. Nevertheless, at this time it has not yet done so. Should you not deliver a plan to Lender to cure this default on or before May 31, 2010, acceptable to Lender in its sole discretion, Lender will accelerate the Loan without further notice to you." The amount FNBO set forth as past due in the Default Letter was wrong, as the cure amount due was only $9,349.20, not $1,350,000.

15.     On May 11, 2010, Guarantor Dr. Bradley Vince attended a meeting with Chris Willis, Tom Flowers, Senior Vice President of FNBO, and Mike Earleywine, President Kansas City division of FNBO, at FNBO's offices. See Affidavit of Bradley D. Vince ("Vince Affidavit") attached as **Exhibit K** to the Supplement to Disclosure Statement, ¶ 17. At the May 11, 2010 Meeting, Dr. Vince, offered to FNBO, in an attempt to bring about global resolution to the Centennial Loan, the following assets, collateral, or potential income:

> i.      The full value of the CD, or the value of the Blocked Account described as FNBO Account No. 0574 (the "Offer of the CD");
>
> ii.     To pledge his stock ownership in Synteract Holdings, Inc., which he believed, in May of 2010 to have a value of $1,100,000 (the "Offer of Stock");
>
> iii.    That FNBO should take 100% of the net proceeds from future lot sales as opposed to the 75% provided for under the Loan Documents;
>
> iv.     That Debtor would cover all expenses on the project, including mowing and taxes, with the exception of interest payments, and would take no loan draws for development fees on a go-forward basis;
>
> v.      That FNB could have the settlement proceeds, when they were available, from a lawsuit that was pending at that time where Debtor was a plaintiff, and certain title companies were defendants; and
>
> vi.     A 2004 Lexus LX-470 4x4 vehicle, which was free and clear, and had a FMV well in excess of $20,000. See Vince Affidavit, ¶ 17.

16.     On May 14, 2010, Dr. Vince renewed his offer to pledge his stock in Synteract Holdings, Inc. which he believed to have a value of about $1,100,000. See Vince Affidavit, ¶ 18.

17.     On June 8, 2010, Dr. Vince again renewed his offer to pledge his stock in Synteract Holdings, Inc.  See Vince Affidavit, ¶ 19.

18.     On June 21, 2010, after FNBO turned down Dr. Vince's offer to pledge his stock in Synteract Holdings, Inc., Dr. Vince offered to pledge collateral that would be acceptable to FNBO with a value of $500,000.00.  See Deposition Transcript of John C. Willis, page 76-77, attached as **Exhibit M** to the Supplement to Disclosure Statement and incorporated herein by reference; Email, dated June 21, 2010, attached as **Exhibit N** to the Supplement to Disclosure Statement.  FNBO never followed up with Dr. Vince regarding Dr. Vince's offer to post additional $500,000.00 of collateral.  An amount that would have excessively backstopped the actual sub $10,000 default.

19.     The Problem Loan Memo, in a notation for "May-10", states:  "Dr. Vince identified about $1,100M [($1,100,000)] of assets that he would and could monetize that could generate as much as $600M [($600,000)] in cash"[2]  The same Problem Loan Memo, in a notation for "Feb-10" stated "He [Dr. Vince] has demonstrated a willingness to support other loans in the form of curtailment; in fact, preferring to simply pay loans off as opposed to just paying down."[3]

20.     By letter dated June 1, 2010, David V. Kenner, on behalf of the Bank, wrote Centennial Park again saying the loan was delinquent for failure to pay $1,350,000.00.  It goes on to state:  "By letter dated May 17, 2010, Lender gave you until May 31, 2010, to deliver a plan to Lender to cure this default, acceptable to Lender in its sole discretion.  If such a plan were not delivered to Lender, we informed you that Lender would accelerate the Loan without further notice to you.  Such plan was not delivered to Lender.  Therefore, . . .Lender is accelerating the Loan as of the date hereof."

---

[2] Problem Loan Memo page with the bates label FNB 000778.

21.     The amount that FNBO set out as delinquent was incorrect, because the past due amount was not $1,350,000.00, but rather was only $9,349.20.  FNBO was looking for a plan to cure an alleged payment default of $1,350,000.00, when FNBO should have been looking for a plan to cure a payment default of only $9,349.20.  It is not surprising that FNBO did not find any of the plans proposed by Defendants acceptable because FNBO so severely misunderstood and misrepresented what the cure plan had to accomplish.  FNBO misrepresented the cure amount due in the Default Letter as a basis to attempt to declare a default under the Loan Documents.  FNBO's misrepresentations of the cure amount due were improper.  The inability of Defendants to propose a plan that FNBO actually found acceptable was directly caused by FNBO's inaccurate and misleading statements to Defendants, both orally and in the Default Letter.

22.     On June 16, 2010, FNBO offset the full value of the CD.  See **Exhibit O** to the Supplement to Disclosure Statement.  On June 16, 2010, the CD had a value of $513,394.97, which included accrued interest of $27,894.97. *Id.*  The Blocked Account Agreement only required BP Centennial, LLC to maintain a minimum balance of $485,500 in the Blocked Account.  See Paragraph 3 of the Blocked Account Agreement.  Thus, as of June 16, 2010, the value of the CD exceeded the minimum required balance by $27,894.97 (i.e. $513,394.97 - $485,500).  Therefore, there were excess funds of $18,545.77 (i.e. $27,894.97 - $9,349.20) available, which greatly exceeded the $9,349.20 additional principal amount due.  In other words, had FNBO simply applied a portion of the accrued interest from the CD to satisfy the $9,349.20 cure amount due, it still would have had the entirety of the $485,500 minimum required CD balance plus an additional $18,545.77 in accrued interest.  FNBO setoff the entirety of the CD funds (including all accrued interest) on June 16, 2010.

---

[3] Problem Loan Memo page with the bates label FNB 000778.

23.    On September 17, 2010, counsel to Dr. Vince, sent to counsel for FNBO a letter outlining the Defendants' disagreement with the FNBO's position that $1,350,000 was due.  See letter attached as **Exhibit P** to Supplement to Disclosure Statement and incorporated herein by reference.  The letter stated: "At this time, and to avoid any doubt about which interpretation is correct; we are tendering with the original of this letter a check to the Bank in the amount of $9,349.20."  The check was received by FNBO, but applied as a "Previous Over Payment".  See **Exhibit Q** to the Supplement to Disclosure Statement and incorporated herein by reference.

24.    Chris Willis, Vice President of FNBO testified that David Kenner received the check with the September 17, 2010 letter, forwarded that letter to FNBO's counsel Jennifer Vath, who then forwarded the check to Chris Willis, who deposited the check.  See Deposition Transcript of John C. Willis, page 92-93.

### FNBO Foreclosure Action

25.    On August 6, 2010, FNBO initiated litigation in the District Court of Johnson County, Kansas, Division 14, styled First National Bank of Kansas v. Centennial Park, LLC, et al., Case No. 10-CV-06988, seeking to foreclose on the Real Property Collateral and bringing an action on the Loan Documents and Guaranty (the "Kansas State Court Action").

26.    Following several hearings on the parties' cross-motions for summary judgment, the most recent of which occurred on June 17, 2010, the State Court ruled from the bench that FNBO's motion for summary judgment would be granted.  The Debtor's and Guarantors' joint motion for summary judgment was previously denied by the State Court.  As part of its bench ruling, the State Court ruled that (i) Centennial Park did not owe FNBO an additional $1,350,000.00 as demanded by FNBO; (ii) that FNBO had to accept lot sales in excess of $1,340,000.00 to the alleged default; (iii) FNBO had accepted in excess of $167,000.00 for the

sale of lot 41; and (iv) the only balance that Debtor owed FNBO as of April 10, 2010 was $9,349.20.

27.     In support of its ruling, the State Court stated that while Kansas appellate courts have not ruled on a similar issue, it had "no doubt" that under the appropriate circumstances, a Kansas trial court may decline to enforce an acceleration clause.  The State Court then went on to analyze the following language in <u>Greenberg v. Service Business Forms Indus.</u>, "a court in equity can relieve a debtor from the hardship of acceleration based on <u>accident</u>, <u>mistake</u>, <u>fraud</u>, or <u>inequitable conduct of the creditor</u>."  882 F.2d 1538 (10th Cir. 1989) (applying Oklahoma law. Emphasis added).  The State Court traced the legal basis in *Greenberg*, and found that the accident, mistake, fraud or inequitable conduct of the creditor exceptions to acceleration were "sensible".  The State Court then stated: "I don't think there is any evidence of fraud in this case. I don't think there is any evidence of inequitable conduct".

28.     It is unclear from the transcript of the State Court's ruling whether the State Court applied either the "accident" or "mistake" exceptions.  What is clear, is that based on the uncontroverted facts, there was certainly an "accident" or "mistake" and quite possibly fraud or inequitable conduct on the part of the creditor, FNBO.  In this case, the accident or mistake started with the incorrect March 31, 2010 billing statement and continued prior to and throughout the Kansas State Court Action when FNBO relentlessly sought an additional $1,350,000 and refused to accept any lesser amount.  There is also evidence of fraud or inequitable conduct on the part of FNBO.  Despite FNBO's unyielding pursuit of an additional $1,350,000, FNBO's internal documents prior to March 31, 2010, indicated that FNBO loan officers reported for loan review purposes and to federal and state regulators that no principal payment was due until maturity.  It was not until after the mistaken March 31, 2010 billing statement was issued that

FNBO's internal documentation changed to indicate that the borrowers failed to make a principal payment in the amount of $1,350,000.

29.     Accordingly, notwithstanding the fact that FNBO created its own erroneous default in the amount of $1,350,000.00 and there is ample evidence that Debtor could have easily cured the actual $9,349.20 default, the State Court granted summary judgment to FNBO.  No journal entry has been entered following the State Court's ruling from the bench.

30.     The foreclosure action has put a significant black cloud over the Real Property Collateral and has effectively stymied all of Debtor's marketing efforts.

***Debtor's Proposed Chapter 11 Plan***

Concurrent with the filing of its voluntary chapter 11 petition and this Adversary Proceeding, the Debtor has filed a chapter 11 plan and disclosure statement (the "Plan").  The Plan proposes to – subject to the Court's determination of the value of the Property – transfer a sufficient amount of the Property to FNBO to satisfy the Indebtedness.  The treatment of creditors under the Plan is described in greater detail below and in the Plan.

**IV.**
**ASSETS AND LIABILITIES OF DEBTOR,**
**FINANCIAL INFORMATION**

The Debtor's Real Property is located in Missouri and Kansas and is described in detail in Exhibits A-1, A-2, and A-3 to the Plan.  The Debtor's scheduled value for the Real Property is $8,700,000.00.   As of the Petition Date, the Debtor scheduled $548,344.36 in personal property.

FNBO has a claim secured by first priority liens on the Real Property in the amount of $8,067,608.42.  The Johnson County Treasurer has a claim for real estate taxes on the Real Property in the amount of $4,780.31.  The Debtor has scheduled general unsecured claims in the aggregate amount of $538,631.68, including claims of insiders.

**SUMMARY OF LIQUIDATING PLAN OF REORGANIZATION**[4]

THE FOLLOWING IS A BRIEF SUMMARY OF THE PLAN. CREDITORS AND HOLDERS OF INTERESTS ARE URGED TO READ THE ENTIRE PLAN, A FILE-STAMPED COPY OF WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A, AND TO CONSULT WITH COUNSEL TO FULLY UNDERSTAND THE PLAN.

The Plan provides for the distribution to Debtor's creditors and interest holders as soon as is practicable. Debtor believes that the Plan is the best result that can realistically be achieved by its creditors and interest holders and recommends a vote in favor of the Plan.

31. Concurrent with the filing of its voluntary chapter 11 petition and this Adversary Proceeding, the Debtor has filed a chapter 11 plan and disclosure statement (the "Plan"). The Plan proposes to – subject to the Court's determination of the value of the Property – transfer a sufficient amount of the Property to FNBO to satisfy the Indebtedness.

Proposed Distribution to FNBO Class 2-B Secured Claim

32. Class 2-B under the Plan consists of the Allowed Secured Claim of FNBO secured by Debtor's interests in the Property. The amount, treatment and status of FNBO's Allowed Secured Claim in this Class shall be subject to determination by the Court. FNBO's claim is also subject to the Court's determination of any avoidance action or any claims, causes of action, offset, setoff or recoupment resulting from the underlying Kansas State Court Action. The FNBO Class 2-B Claim derives from the Loan Documents and is: (i) secured by a first-position lien on the Kansas Property, the Excess Property, the Escrow Account and all other

---

[4] All capitalized terms used, but not defined in this section, shall have the meanings ascribed to such terms in the Plan filed concurrently herewith.

personal property and funds owned by the Debtor; and (ii) allegedly secured by a first-position lien on the Missouri Property. Class 2-B is impaired.

33.     In conjunction with the hearing to be held on confirmation of the Plan, the Court will determine the value of the Kansas Property, Missouri Property, Excess Property, Escrow Account and all other personal property, funds and other property owned by the Debtor as of the confirmation hearing. On the Effective Date of the Plan, based on the Court's determination of values of the Kansas Property, Missouri Property, Excess Property, Escrow Account and all other personal property, funds and other property owned by the Debtor, the foregoing Property shall be distributed to FNBO in the order that such property appears listed on **Exhibit A** to the Plan in an amount sufficient to the extent necessary to satisfy the Indebtedness. Any distributions of the Property to the Indebtedness shall be credited in the Kansas State Court Action with regard to outstanding balance due to FNBO therein. To the extent that the Property distributed to FNBO satisfies the Indebtedness in full, the Kansas State Court Action shall be dismissed with prejudice to FNBO. Any distributions of the Kansas Property, Missouri Property or Excess Property to FNBO shall be effectuated through the execution of the Quitclaim Deed attached as Exhibit B to the Plan.

34.     At or before the hearing to confirm the Plan, the Debtor shall submit evidence regarding outstanding real estate taxes on the Kansas Property, Missouri Property, and Excess Property. Any outstanding real estate tax (including related interest and penalties, if any) amounts shall deducted from the Court determined value of Kansas Property, Missouri Property, and/ or Excess Property to be distributed to FNBO. Accordingly, distributions of Kansas Property, Missouri Property, and/ or Excess Property to FNBO pursuant to the Plan shall be subject to Kansas and Missouri real estate taxes, including related interest and penalties. To the

SLC-6397310-3

15

extent that the Debtor retains any of the Kansas Property, Missouri Property, and/ or Excess Property pursuant to the confirmed Plan, then Debtor shall pay all outstanding real estate taxes, including related interest and penalties, on such property retained by Debtor.

35.     Following the Court's determination of values of the Kansas Property, the Missouri Property, the Excess Property, the Escrow Account and all other personal property, funds and other property owned by the Debtor, distribution to Class 2-B shall be effectuated as follows:

A.     If the aggregate value of the Property exceeds the Indebtedness, the Property shall be distributed to FNBO in the order that it appears in **Exhibit A** to the Plan. Upon satisfaction of the Indebtedness, any remaining Property shall be released to the Debtor free and clear from any claims of FNBO;

B.     If the aggregate value of the Property is equal to the Indebtedness, then FNBO's claim against the Debtor shall be satisfied in full; and

C.     If the aggregate value of the Property is less than the Indebtedness, then any remaining balance owed to FNBO shall remain as an unsecured claim pursuant to Class 3-B of the Plan and FNBO's sole remedy shall be pursuant to the Kansas State Court Action against the Guarantors.  If FNBO makes an election pursuant to section 1111(b) of the Bankruptcy Code, then distribution scenario No. 1 above, shall apply.

36.     FNBO has been provided with title policies on the Kansas Property, Missouri Property and Excess Property and those title policies describe easements and restrictions of record on the foregoing properties.  The Quitclaim Deed attached as **Exhibit B** to the Plan shall be executed in connection with any distributions of the Kansas Property, Missouri Property and Excess Property shall be subject to these easements and restrictions of record.

37.     If, in connection with the hearing on Plan Confirmation, the Court determines that the aggregate value of the Property is less than the Indebtedness, then any remaining balance owed to FNBO shall remain as an unsecured claim pursuant to Class 3-B of the Plan and

FNBO's sole remedy shall be pursuant to the Kansas State Court Action against the Guarantors. No payment shall be made on this Claim under the Plan.

<u>Distribution to General Unsecured Class 3-A</u>

38.     This Class consists of all Allowed Unsecured Claims of Creditors holding Allowed Unsecured Claims against Debtor that are not otherwise specifically treated in this Plan. This Class is impaired.

39.     If the Court determines the value of the Property is in excess of the amount of the Allowed Secured Claim of FNBO, all members of Class 3-A shall receive a distribution of excess Property up to a payment in full of any Allowed Claim they possess upon the Effective Date of the Plan.

40.     If the Court determines the value of the Property is not sufficient to provide a distribution of 20% to Allowed Class 3-A claims and if Class 3-A votes to accept the Plan, then the Guarantors shall provide funds to enable a distribution of 20% (together with Guarantors' agreement to fund Debtor's administrative expenses if Debtor's Property is insufficient to make pay such claims in full, the "<u>Guarantors' Plan Contributions</u>") to Allowed Class 3-A claims, which funds shall take into account any distribution that Allowed Class 3-A Claims receive on account of the Property.   The payment by Guarantors, if any, shall be made by Guarantors through a contribution to Debtor.

41.     In connection with the confirmation of the Plan, the Court shall determine the balance due to FNBO, including interest, fees (including, but not limited to, attorneys' fees), charges, to the extent that FNBP is entitled to same pursuant to section 506(b) of the Bankruptcy Code (the "<u>Indebtedness</u>").

42. The specific treatment of other classes of creditors is described in detail in the below and in the Plan filed concurrently herewith.

43. The Debtor is hopeful that it can obtain an order confirming its Plan within ninety (90) days of the Petition Date.The following is a designation of the classes of claims and interests under the Plan. A claim or interest is classified in a particular class only to the extent that the claim or interest qualifies within the description of that class and is classified in a different class to the extent that any remainder of the claim or interest qualifies within the description of such different class. A claim or interest is in a particular class only to the extent that the claim or interest is an Allowed Claim or Allowed Interest in that class and has not been paid, released or otherwise satisfied before the Effective Date.

## DISCUSSION OF ADMINISTRATIVE CLAIMS.

The Debtor anticipates that Administrative Expense Claims will consist primarily of Debtor's professional fees and tax claims

## DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS.

Set forth below are the Classes of Creditors and Interest Holders in Debtor's Plan:

**Class 1: Priority Claims**

Class 1-A consists of Allowed Priority Claims under 11 U.S.C. § 503 and § 507(a)(2) (Administrative Claims). Class 1-A claims are unimpaired.

Class 1-B consists of Allowed Priority Claims under 11 U.S.C. §507(a)(8) (Tax Claims). Class 1-B claims are unimpaired.

**Class 2: Secured Claims**

Class 2-A consists of the Allowed Claims of Johnson County Kansas and Jackson County Missouri secured by tax liens in the Property. Class 2-A claims are impaired.

Class 2-B consists of the Allowed Secured Claim of FNB secured by CP's interest in the Property. Class 2-B claims are impaired.

**Class 3: Unsecured Claims**

> Class 3-A consists of the Allowed Unsecured Claims of Creditors holding Allowed Unsecured Claims against Debtor that are not otherwise treated in the Plan. Class 3-A claims are impaired.

> Class 3-B consists of the Allowed Unsecured Claim, if any, of Creditor First National Bank that is not otherwise treated in the Plan. Class 3-B claims are impaired.

> Class 3-C consists of the Allowed Unsecured Claim of Creditor BP Centennial, LLC. Class 3-C claims are impaired.

**Class 4: Insider Claims**

> Class 4-A consists of the Allowed Claims of Insiders holding Allowed Unsecured Claims against Debtor that are not otherwise treated in the Plan. Class 4-A claims are impaired.

Only those claimants whose claims or interests are impaired under the Plan may cast ballots with respect to acceptance or rejection of the Plan. A specimen of the ballot is attached hereto as **Exhibit R** to the Supplement to Disclosure Statement for the convenience of the reader. A class is not impaired under the terms of the Plan if the claims or interests of such class receive the allowed amount of such claims or interests in cash or other property of the Debtor equal to the allowed amount of such claims or interests as of the Effective Date, or as soon thereafter as practicable. Under the Plan, Classes 2-A, 2-B, 3-A, 3-B, 3-C and 4-A are impaired and, accordingly, may cast ballots with respect to acceptance or rejection of the Plan.

A class is impaired under the Plan if the claims or interests of such class do not receive the allowed amount of such claims or interests in cash or other property of the Debtor equal to the allowed amount of such claims or interests as of the Effective Date, or as soon thereafter as practicable. The Allowed Claims of creditors in Classes 2-A, 2-B, 3-A, 3-B, 3-C and 4-A are impaired to the extent that they are paid over time, on various terms and conditions, or not paid

at all.  Terms and conditions are set forth in detail in the Plan and should be carefully reviewed by the members of these classes.

## TREATMENT OF CLASSES OF CLAIMS AND INTERESTS

### Class 1:  Priority Claims

#### 1.      Class 1-A: Administrative Claims

This Class consists of Allowed Priority Claims under 11 U.S.C. §§ 503 and 507(a)(2) – administrative priority claims.  Unless Claimants holding Claims in this Class agree to an alternative form of treatment, the Allowed Claims of Class 1-A shall be paid in full, in cash, on or before the Effective Date, or as the same are Allowed and ordered paid by the Court.  Any Class 1-A Claim not allowed as of the Effective Date shall be paid as soon thereafter as it is allowed by the Court according to the terms of this Class.  This Class is not impaired.

#### 2.      Class 1-B:  Tax Claims

This Class consists of Allowed Priority Claims under 11 U.S.C. § 507(a)(8) – tax Claims which are not otherwise treated as secured claims herein.  As provided in 11 U.S.C. § 1129(a)(9)(C), unless Claimants holding Claims in this Class agree to an alternative form of treatment, the Allowed Priority Claims of Class 1-B shall be paid in full, in cash, on or before the Effective Date, or, at the Debtor's option, such Allowed Claims shall be paid, on account of such Allowed Claim, deferred cash payments, over a period not exceeding six years after the date of assessment of such Claim, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim.  Any Class 1-B Claims not allowed as of the Effective Date shall be paid as soon thereafter as they are allowed by the Court according to the terms of this Class.  This Class is not impaired.

**Class 2:  Secured Claims**

    1.    **Class 2-A – Allowed Secured Tax Claims of Johnson County, Kansas and Jackson County, Kansas**

This Class consists of the Allowed Secured Claim of Johnson County, Kansas ("Johnson County") that is secured by a real property tax lien on the Kansas Property and of the Allowed Secured Claim of Jackson County, Missouri ("Jackson County") that is secured by a real property tax lien on the Missouri Property.  This Class is impaired.

To the extent any of Kansas Property is distributed to FNBO, the distributed Kansas Property shall be subject to any Johnson County taxes on the Kansas Property.  To the extent any of the Missouri or Excess Property is distributed to FNBO, the distributed Missouri Property or Excess Property shall be subject to any Jackson County taxes on the Missouri Property or Excess Property.  If less than all the Kansas, Missouri or Excess Property is distributed to FNBO, any of the Kansas Property, Missouri Property, and Excess Property retained by the Debtor and distributed in accordance with Article III of the Plan, shall remain subject to the real property taxes, interest and penalties on such property.  The real property taxes, interest and penalties associated with any Property retained by the Debtor shall be paid as set forth in the Plan treatment of Class 1-B.

    2.    **Class 2-B – Allowed Secured Claim of FNBO secured by Debtor's Interests in the Property**

This Class consists of the Allowed Secured Claim of FNBO secured by Debtor's interests in the Property.  The amount, treatment and status of FNBO's Allowed Secured Claim in this Class shall be subject to determination by the Court.   FNBO's claim is also subject to the Court's determination of any Avoidance Action or any claims, causes of action, offset, setoff or recoupment resulting from the underlying state court litigation.  The FNBO Class 2-B Claim derives from the Loan Documents and is:  (i) secured by a first-position lien on the Kansas

Property, the Excess Property, the Escrow Account and all other personal property and funds owned by the Debtor; and (ii) allegedly secured by a first-position lien on the Missouri Property. This Class is impaired.

In conjunction with the hearing to be held on confirmation of the Plan, the Court will determine the value of the Kansas Property, Missouri Property, Excess Property, Escrow Account and all other personal property, funds and other property owned by the Debtor as of the confirmation hearing. On the Effective Date, based on the Court's determination of values of the Kansas Property, Missouri Property, Excess Property, Escrow Account and all other personal property, funds and other property owned by the Debtor, the foregoing Property shall be distributed to FNBO in the order that such property appears listed on **Exhibit A** to the Plan in an amount sufficient to the extent necessary to satisfy the Indebtedness. Any distributions of the Property to the Indebtedness shall be credited in the Kansas State Court Action with regard to outstanding balance due to FNBO therein. To the extent that the Property distributed to FNBO satisfies the Indebtedness in full, the Kansas State Court Action shall be dismissed with prejudice to FNBO. Any distributions of the Kansas Property, Missouri Property or Excess Property to FNBO shall be effectuated through the execution of the Quitclaim Deed attached as **Exhibit B** to the Plan.

At or before the hearing to confirm the Plan, the Debtor shall submit evidence regarding outstanding real estate taxes on the Kansas Property, Missouri Property, and Excess Property. Any outstanding real estate tax (including related interest and penalties, if any) amounts shall deducted from the Court determined value of Kansas Property, Missouri Property, and/ or Excess Property to be distributed to FNBO. Accordingly, distributions of Kansas Property, Missouri Property, and/ or Excess Property to FNBO pursuant to the Plan shall be subject to

Kansas and Missouri real estate taxes, including related interest and penalties. To the extent that the Debtor retains any of the Kansas Property, Missouri Property, and/ or Excess Property pursuant to the confirmed Plan, then Debtor shall pay all outstanding real estate taxes, including related interest and penalties, on such property retained by Debtor.

*Three Distribution Scenarios for Class 2-B*

Following the Court's determination of values of the Kansas Property, the Missouri Property, the Excess Property, the Escrow Account and all other personal property, funds and other property owned by the Debtor, distribution to Class 2-B shall be effectuated as follows:

1. If the aggregate value of the Property exceeds the Indebtedness, the Property shall be distributed to FNBO in the order that it appears in Exhibit A to the Plan. Upon satisfaction of the Indebtedness, any remaining Property shall be released to the Debtor free and clear from any claims of FNBO;

2. If the aggregate value of the Property is equal to the Indebtedness, then FNBO's claim against the Debtor shall be satisfied in full; and

3. If the aggregate value of the Property is less than the Indebtedness, then any remaining balance owed to FNBO shall remain as an unsecured claim pursuant to Class 3-B of the Plan and FNBO's sole remedy shall be pursuant to the Kansas State Court Action against the Guarantors. If FNBO makes an election pursuant to section 1111(b) of the Bankruptcy Code, then distribution scenario No. 1 above, shall apply.

FNBO has been provided with title policies on the Kansas Property, Missouri Property and Excess Property and those title policies describe easements and restrictions of record on the foregoing properties. The Quitclaim Deed attached as **Exhibit B** to the Plan shall be executed in connection with any distributions of the Kansas Property, Missouri Property and Excess Property shall be subject to these easements and restrictions of record.

**Class 3:  Allowed Unsecured Claims**

1. **Class 3-A – Allowed Unsecured Claims against Debtor**

This Class consists of all Allowed Unsecured Claims of Creditors holding Allowed

Unsecured Claims against Debtor that are not otherwise specifically treated in this Plan. This Class is impaired.

If the Court determines the value of the Property is in excess of the amount of the Allowed Secured Claim of FNBO, all members of Class 3-A shall receive a distribution of excess Property up to a payment in full of any Allowed Claim they possess upon the Effective Date of the Plan.

If the Court determines the value of the Property is not sufficient to provide a distribution of 20% to Allowed Class 3-A claims and if Class 3-A votes to accept the Plan, then the Guarantors shall provide funds to enable a distribution of 20% to Allowed Class 3-A claims, which funds shall take into account any distribution that Allowed Class 3-A Claims receive on account of the Property. The payment by Guarantors, if any, shall be made by Guarantors through a contribution to Debtor.

### 2. Class 3-B – Allowed Unsecured Claim of FNBO

This Class consists of any Allowed Unsecured Deficiency Claim of Creditor FNBO against Debtor that may result if: (1) the Court values the Property at less than the Indebtedness; and (2) Creditor FNBO does not exercise its rights under 11 U.S.C. § 1111(b). Class 3-B is impaired.

If, in connection with the hearing on Plan Confirmation, the Court determines that the aggregate value of the Property is less than the Indebtedness, then any remaining balance owed to FNBO shall remain as an unsecured claim pursuant to Class 3-B of the Plan and FNBO's sole remedy shall be pursuant to the Kansas State Court Action against the Guarantors. No payment shall be made on this Claim under the Plan.

3. **Class 3-C – Allowed Unsecured Claim of BP Centennial Park, LLC**

This Class is made up of only BP Centennial Park. This Class is an Insider and is Impaired.

To the extent the value of the Property is less than or equal to the amount of the Indebtedness, this Class shall receive nothing under the Plan.

To the extent the value of the Property is greater than the Indebtedness, this Class shall receive all remaining Property not transferred to FNBO pursuant to Class 2-B of the Plan. To the extent that there is sufficient Property remaining to satisfy this Class in full, Debtor shall select the Property transferred in same manner and with the same restrictions and requirements as it did with Class 2-B. Any Property distributed to Class 3-C shall in turn be distributed to Class 4-A free and clear of all liens, interests and claims, except for Allowed Claims of Johnson County and Jackson County for taxes, interests and penalties.

4. **Class 4-A**

This class is made up of the equity holders of Debtor. This Class is an Insider and is impaired. To the extent any Property remains after satisfaction of Class 3-C, such Property shall be distributed to Class 4-A free and clear of all liens, interests and claims, excepting only the Allowed Claims of Johnson County or Jackson County, except for Allowed Claims of Johnson County and Jackson County for taxes, interests and penalties.

## VI.
## FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The implementation of the Plan by Debtor and participation thereunder by holders of claims and interests may have certain tax consequences. These consequences, of course, will depend on each holder's individual circumstances and, accordingly, Debtor cannot advise regarding potential tax effects predicated upon multiple hypothetical sets of circumstances.

YOU ARE THEREFORE URGED TO CONSULT YOUR OWN TAX ADVISOR AS TO THE POSSIBLE TAX CONSEQUENCES OF YOUR PARTICIPATION IN THE PLAN.

## VII.
## LIQUIDATION ANALYSIS

To make an informed decision on whether to accept or reject the Plan, creditors may wish to compare the return on their claims that will be received under the Plan with the return that would be received in the event this case was to be converted to a case under Chapter 7 of the Bankruptcy Code. In a Chapter 7 case, a trustee would be appointed and would proceed to liquidate the Debtor's non-exempt assets and distribute the proceeds of the liquidation in accordance with the priorities established under the Bankruptcy Code; in the alternative, the trustee could abandon the Debtor's assets and allow the secured claimants to execute upon their liens.

If a Chapter 7 trustee is appointed all creditors holding Allowed administrative priority claims, Allowed priority tax claims, Allowed priority non-tax claims and Allowed unsecured claims are likely to receive distributions of a lesser value on their claims than they would under the Plan. A chapter 7 trustee who would lack the Debtor's knowledge of its business affairs would be required to invest substantial time and resources to investigate the various Claims filed against the Debtor and would likely incur professional fees and costs associated therewith in addition to statutory fees awarded to Chapter 7 trustees. Debtor believes that the liquidation of its assets would result in a lesser recovery to unsecured claims.

**Anticipated Distribution to Creditors Pursuant to Plan**

The Debtor anticipates that Class 3-A Allowed Unsecured Claims will receive a dividend of not less than 20%.

Case 11-22026    Doc# 4    Filed 07/04/11    Page 26 of 27

# VIII.
# CONCLUSION

After taking into account all facts, it is the opinion of Debtor that acceptance of the Plan is the only viable alternative available to creditors and interest holders, is in the best interests of all creditors, interest holders and parties in interest, and will provide creditors and interest holders with the maximum recovery in the minimum amount of time. Each voting creditor and interest holder are urged to accept the Plan by executing the enclosed Ballot and returning it to the address indicated thereon.

Respectfully submitted,

*s/ John J. Cruciani*
Christopher J. Redmond     #07307
John J. Cruciani               #16883
Marshall Turner
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, Missouri 64112
(816) 983-8000; FAX (816) 983-8080
christopher.redmond@huschblackwell.com
john.cruciani@huschblackwell.com
marshall.turner@huschblackwell.com

*Attorneys for Centennial Park LLC, Debtor*