**SO ORDERED.**

**SIGNED this 14th day of November, 2011.**



Dale L. Somers
United States Bankruptcy Judge

---

**For on-line use but not print publication**
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

In re:

**CENTENNIAL PARK, LLC,**

                **DEBTOR.**

**CASE NO. 11-22026**
**CHAPTER 11**

**MEMORANDUM OPINION ON**
**REAL PROPERTY VALUATION**

On October 18 and 19, 2011, the Court held an evidentiary hearing[1] on valuation

of the real property securing the claim of First National Bank of Omaha (FNBO or Bank)

---

[1] The hearing was combined with the hearing on Debtor's Objection to Claim #5 of First National Bank of Omaha (Doc. 66). A separate memorandum opinion will be filed on that issue.
    Debtor appeared by Christopher J. Redmond and John J. Cruciani of Husch Blackwell, LLP. Creditor First National Bank of Omaha appeared by Jennifer K. Vath and Patrick Maxcy of SNR Denton US LLP. Dr. Bradley D. Vince, a guarantor of Debtor's debt to FNBO and managing member of BP Centennial, LLC, a 50% owner of Debtor, appeared by Paul D. Sinclair and Brendan L. McPherson of Polsinelli Shughart PC. There were no other appearances.

for purposes of confirmation of Debtor's proposed Chapter 11 plan, an issue set for hearing by the Court prior to the confirmation hearing because of its central role in the confirmation process.[2]  The principal testimony was the conflicting views of two expert appraisers.  The Court finds the valuation of Bank's appraiser is more likely to be correct than that of Debtor's appraiser and holds, for the purpose of plan confirmation, the value of Debtor's real property is $3,570,000.

## BACKGROUND FACTS.

This is a single asset Chapter 11 case filed by Debtor Centennial Park, LLC (Debtor or Centennial Park), on July 4, 2011.  Debtor's principal asset is real estate comprised of approximately 45.43 acres of development land commonly known as Centennial Business Park (Business Park)[3] and approximately 33 acres of adjacent, unplatted agricultural land (Agricultural Land), located in Johnson County, Kansas, and Jackson County, Missouri.  The combined Business Park and the Agricultural Land are referred to as the Real Property.

---

[2] This Court has jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b) and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984.  The valuation of property for purposes of plan confirmation is a core proceeding which this Court may hear and determine as provided in 28 U.S.C. § 157(b)(2)(A), (B), and (L).  There is no objection to venue or jurisdiction over the parties.

[3] The Witt Appraisal (exh. S) states it contains 45.09 acres, and the CBRE Appraisal (exh. 3) states it contains 45.43 acres.  For some calculations, Witt used a total of 1,964,082 square feet and CBRE used 1,979,134 square feet.

Development of the Business Park commenced approximately 20 years ago. Debtor acquired the Real Property in 2006 for $6,988,028 cash,[4] after it was partially developed and some lots had been sold. Debtor's acquisition debt, originally held by Intrust Bank, was refinanced by First National Bank of Kansas (FNBK). On or about May 7, 2008, FNBK purchased the Centennial Park loan (Loan) from Intrust Bank, and Centennial Park executed an Amended and Restated Promissory Note (Note), in the principal amount of $9,716,600, and other Loan documents. FNBO later became the owner of the Loan when it acquired FNBK by merger. For convenience, the Court will refer to the owner of the Loan as Bank, without distinction between FNBK and FNBO. The Loan is secured by perfected liens on all property of Centennial Park, including the Real Property,[5] and payment is personally guaranteed by two individuals who control Debtor.

Centennial Park filed for relief under Chapter 11 on July 4, 2011, and concurrently filed its disclosure statement and a proposed Chapter 11 plan. Debtor's schedules list assets valued at $9,186,018.36, of which $8,700,000 is given as the value of the Business Park and adjacent Agricultural Land. Debtor's proposed Chapter 11 plan is a liquidating plan. It proposes that the Court value Debtor's property, including the Business Park and Agricultural Land. With respect to Bank's claim, the plan is a "dirt-for-debt" plan.

---

[4] Exh. 3, p. 1.

[5] The perfection as to the Real Property was accomplished by the proper recording of a mortgage on the property located in Kansas and a deed of trust for the property located in Missouri.

3

Bank's secured claim is to be satisfied by distribution of property having a Court-determined value up to the amount of the claim, with an unsecured deficiency claim (to be collected only from the guarantors via litigation in state court) if the property is valued (after payment of real estate taxes) at less than Bank's allowed secured claim. If the Court-determined value of Debtor's property exceeds the secured claims, unsecured creditors shall receive a distribution of the excess property. If this is not sufficient to provide a 20% distribution to unsecured creditors other than BP Centennial LLC and Bank, the guarantors shall provide funds to enable a 20% distribution, which would be approximately $10,600.[6] The guarantors have also agreed to pay administrative expenses if Debtor's property is insufficient to pay such claims in full.

During hearings early in the case, the Court became aware of a wide divergence of opinion between Debtor and Bank as to the value of Debtor's Real Property.[7] In its objection to Debtor's disclosure statement, Bank suggested the Court set a hearing date for the purpose of determining Bank's secured status pursuant to 11 U.S.C. § 506(a) prior to the confirmation hearing to provide a factual basis for possible objections to the

---

[6] The total unsecured claims (excluding the undersecured portion of Bank's claim) are $538,631.68. When BP Centennial's claim of $485,550.00 is subtracted, this leaves a balance of approximately $53,000, 20% of which is $10,600.

[7] *See, e.g.*, Adv. No. 11-6172, Dkt. 23, pp. 14-15 (contention that Debtor's value is far in excess of market value). Debtor's Schedule A assigned a value of $8,700,000 to the Real Property, subject to a lien of $8,072,388.73. The proposed plan is obviously based upon the premise that Bank's claim is essentially fully secured. On August 18, 2011, Bank filed a proof of claim for $8,074,244.80, $3,570,000.00 of which was alleged to be secured. Proof of Claim No. 5-1. An amended proof of claim was filed on September 12, 2011, changing the portion of the claim identified as an arrearage, but not the total of the claim or the amount of the secured claim.

4

proposed plan. The Court thereafter scheduled the present hearing to determine the value of the Real Property for plan confirmation purposes.

**VALUATION OF DEBTOR'S REAL PROPERTY.**

### A. Positions of the Parties - Debtor's Value is $7,700,000 but Bank's Value is $3,570,000.

The parties' values of the Business Park and the Agricultural Land differ significantly. Debtor contends the total market value is $7,700,000, but Bank contends the total market value is $3,570,000. Both valuations are supported by the testimony of expert, professional appraisers. Debtor's appraiser is Larry P.Witt of Dillon & Witt, Inc. (Witt). Bank's appraiser is P. Scott Ryan of CB Richard Ellis (CBRE).

The task before the Court is therefore to determine the value of the Real Property in light of this conflict. This Court, like others, finds "valuation is not an exact science."[8] Compounding the difficulty is the fact that in bankruptcy cases, the value of the same property may vary with the purpose of the valuation and the proposed disposition of the property.[9] In this case, where the valuation is being determined for the purpose of Debtor's plan to turn the Real Property over to Bank with credit on Bank's claim in the amount of the Court-determined value, a conservative valuation is appropriate. As one court stated in the context of a "dirt-for-debt" plan proposing to return to the oversecured creditor only a portion of its collateral with a value equal to the amount of its claim:

---

[8] *In re Sandy Ridge Devel. Corp.*, 881 F.2d 1346, 1354 (5th Cir. 1989).

[9] 11 U.S.C. § 506(a) ("value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of [the] property").

5

Valuation in these circumstances should be approached conservatively for at least three reasons. First, the Plan shifts the burden of sale of the 131 acres from the Debtors to the secured creditor. By doing so, the Debtors have shifted the risk of loss, as well as the potential for gain, to the secured creditor. In this circumstance, the potential for loss is greater than the potential for gain due to the nature of the property and the depressed nature of the existing market for the sale of this type of property in the area where the property is located. Second, the secured claimant will not be earning interest on this portion of the secured claim until such time as the property is sold and converted into cash. The secured claimant is, in effect, getting a partial payment in kind that must be turned to cash prior to receiving a return. This was not part of the original bargain. To adequately protect the Lesters' secured claim (which is oversecured) the valuation of the portion to be returned should be on a conservative basis. Third, valuation is not an exact science, and the chance for error always exists. A conservative approach should, therefore, be taken in order to protect the secured creditor in this regard.[10]

Even though Bank is not oversecured and Debtor does not propose to transfer only a portion of the Real Property, the Court has similar concerns about valuation in this case. There is no question that if the proposed plan is confirmed, (1) the risk of any loss in the value of the Real Property would be shifted to Bank, (2) until Bank can sell the Real Property, it will receive no interest, and (3) the Court's determination of the value of the Real Property is very inexact.

### B. Evidence, Findings of Fact, and Conclusions of Law.

---

[10] *In re Simons,* 113 B.R. 942, 947 (Bankr. W.D. Tex. 1990). *See also In re Atlanta Southern Business Park, LTD*, 173 B.R. 444, 450 (Bankr. N.D. Ga. 1994) (stating in debt-for-dirt plan, "valuation process needed to be conservative," and quoting *Simons*, 113 B.R. at 947); *In re Park Forest Dev. Corp.*, 197 B.R. 388, 396-97 (Bankr. N.D. Ga. 1996) (in dirt-for-debt plan, "valuation of real estate . . . should be very conservative and allow the secured creditor an ample margin for error").

### 1. Appraisal Valuation Methods, Property Characteristics, and Summary of Competing Appraised Values.

Debtor's appraiser and Bank's appraiser both used the same valuation methods: the sales comparison approach and the subdivision development or development income approach.[11] Each appraiser then reconciled the values from the two methods to arrive at an estimated market value. The sales comparison approach is a method of analyzing sales of similar, recently sold parcels to arrive at a probable sale price for the property being appraised. In applying the sales comparison approach to the Business Park, a bulk sales analysis was performed under which the aggregate retail value of the individual lots determined by comparable sales was discounted to represent a bulk sale, that is, a sale of all lots as a unit to a single purchaser at the same time.

Both appraisers also used the second method, the subdivision development or development income method, to value the Business Park. In this method, the appraiser estimates the value of the land based upon the present value of the income stream to be generated by the sale of the individual lots within the development over an estimated holding period. This is a multi-step procedure. First, the present market value of individual lots is determined based upon the sales comparison approach. Next, the time period over which all of the lots will be sold, the absorption rate, is estimated and used to determine the estimated yearly cash flow from sales. Next, estimated expenses are

_____

[11] Although CBRE called this the "subdivision development approach" and Witt called it the "development income approach," their explanations show they considered similar factors and made similar calculations despite the different names.

7

subtracted from cash flow. Finally, the estimated net cash flow is discounted to present value.

The appraisers also agree about the characteristics of and the highest and best uses for the Real Property. As noted by both appraisers, the Agricultural Land is approximately 34 acres located in Missouri, southeast of the Business Park, south of a Union Pacific Railroad line, and north of the Blue River. Parts of it lie within a flood plain. The tract is split by Missouri Highway 150 right-of-way and has no legal physical access. It is zoned for agricultural use and is used for that purpose, with access via a private drive over adjacent land. Continued agricultural use is the land's highest and best use.

The Business Park is divided into lots. Most, or perhaps all, improvements such as streets have been completed. When the Business Park was initially developed, it comprised approximately 100 acres and 52 lots.[12] The part of the Business Park Debtor now owns, approximately 45 acres, is divided into 30 lots held for sale. The Business Park is located partly in Leawood, Kansas, and partly in Kansas City, Missouri. It lies north of 143rd Street/Wyandotte Street, between Kenneth Road on the west and Missouri Highway 150 on the east. The area west of the property is newer, high-end residential development. Commercial growth in the area has occurred along primary commercial thoroughfares, such as State Line Road, 135th Street to the north, and Missouri Highway

---

[12] Exh. U, p. 32.

150.  Access to the Business Park is good.  The Kansas portion is zoned as a planned business park, and the Missouri portion is zoned "M1-5," which allows for light industrial uses, consistent with the development plan for the Business Park.

The following table compares the important elements of the two competing appraisals.

| Appraiser | Sales Comparison Method | | | | | Subdivision Development or Development Income Method | | | Total Value |
|---|---|---|---|---|---|---|---|---|---|
| | Ag | Business Park | | | | Business Park | | | |
| | Value | Price / sq ft | Total value (mill) | Bulk discount rate | Final value (mill) | Absorption rate (years) | Discount rate | Final value (mill) | Total value (mill) |
| Witt | 345,000 | 6.41 | 12.585 | 40% | 7.551 | 4.5 | 17.5 to 18% | 7.355 | 7.700 |
| CBRE | 170,000 | 5.50 | 10.885 | 65% | 3.800 | 10 | 25% | 3.400 | 3.570 |

The Court has carefully reviewed both appraisals and the additional evidence before the Court.  For the following reasons, the Court finds that Bank's value presented by the CBRE Appraisal Report is better supported than Debtor's value presented by the Witt Appraisal Report.  The Court rules that the value of the Real Property for purposes of the confirmation hearing shall be $3,570,000.

> **2.  The CBRE Appraisal of the Agricultural Land Is More Credible than the Witt Appraisal of the Agricultural Land.**

First, the Court finds CBRE's appraised value of $170,000 for the Agricultural Land to be more credible than the value of $345,000 presented by Witt.  Both appraisals used the

9

comparable sales approach to estimate the market value. Three comparables were used by Witt in its analysis. Two were sales in the summer of 2007, before the 2008 downturn in the real estate market, which sluggishness persists in 2011. But Witt made no adjustments in the historical sales data to account for the sale dates. The two properties sold in 2007 were located in Cleveland, Mo., approximately 11 miles south of the Agricultural Land, outside the Kansas City metropolitan area. The third comparable was a distressed sale of a residential development located at Nall and 183rd Terrace in Stilwell, Kansas. The residential property was not located in a flood plain. And, when adjusting the prices of all three tracts, Witt made no adjustments for the lack of access to the Agricultural Land.

The CBRE Appraisal likewise relied upon three comparable sales to determine the value of the Agricultural Land was $170,000. Two were sales in 2010 in Kansas City, Missouri, not far from the subject property. One of these tracts was zoned agricultural and was considered comparable to the subject property in all respects except access, for which an adjustment was made. The second Kansas City sale was adjusted for that property's residential zoning, superior access, and superior location. The third tract was a sale in December 2008 of 80 acres zoned for agricultural use in Sibley, Missouri. As to all three tracts, 25% adjustments were made to reflect the lack of access to the Agricultural Land. The Court finds the CBRE value more credible than the Witt value.

### 3. The CBRE Appraisal of the Business Park Is More Credible than the Witt Appraisal of the Business Park.

The Court likewise finds the CBRE valuation of $3,400,000 for the Business Park to be more credible than the Witt valuation of $7,355,000. As the first step in valuation of the Business Park, both appraisers estimated the total market value for the 30 lots as of the appraisal date by the use of comparable sales. The comparables used by Witt included sales of four lots in the Business Park, one in 2007, two in 2008, and one in 2010, the average price for which was $6.05 per square foot. Witt also considered 23 comparable sales from late 2006 through 2011 of development tracts along the 135th Street corridor in Johnson County, Kansas, scattered tracts in Jackson County, Missouri, and other areas. The comparables included two sales of multifamily development sites. Witt then assigned a value to each lot in the Business Park, which varied between $9.00 and $5.75 per square foot. But the Witt Report contained no grid showing the specific comparables used for each lot and the adjustments made. This approach resulted in a total market value of $12,585,000, an average of $6.41 per square foot.

The CBRE Appraisal used four business park sales in the Kansas City area occurring between January 2009 and April 2010 as comparables. Adjustments of these sale prices were shown on a grid and resulted in comparable prices from $3.77 to $5.56 per square foot. The report also noted that "discussions with market participants who are active in the local land market indicated sale prices for $5.00 to $6.00 per square foot for the subject lots."[13] After noting the sales of lots in the Business Park from 2007 through 2010, the

---

[13] Exh. 3, p. 32.

CBRE Appraisal concluded that the aggregate retail value of the 30 lots was $10,888,237, with an average value of $5.50 per square foot.

The Court finds the CBRE Appraisal's price of $5.50 per square foot to be more credible than the $6.41 per square foot value of the Witt Appraisal. The CBRE valuation was based primarily upon recent sales of lots for industrial or office development in the Kansas City area. The Witt Appraisal relied upon the four sales of lots in the Business Park, three of which were prior to 2009, and 23 other sales, including some in residential developments. Although the per-square-foot sales prices for the Witt comparable tracts varied from $3.50 per square foot to more than $25.00 per square foot, neither the Witt Appraisal Report nor Mr. Witt's testimony included any tract by tract adjustment of these comparable tracts to more closely match the characteristics of the subject lots. Also, since the portion of the Business Park located in Missouri could not be used for residential purposes without a use permit and the Kansas property would have to be rezoned for such a use, the Court finds that the Witt Report's consideration of values based on residential use is improper, particularly where there was no explanation of any adjustments. Witt's comparable sales extended over many years, including the period before the downturn in economic activity which continues today. As noted by the Witt Appraisal, sales of the lots in the Business Park from 2007 through 2010, most of which were before the downturn in real estate market conditions, averaged $6.05 per square foot. Witt's analysis does not convince the Court that the higher value of $6.41 per square foot is correct.

12

After estimating the per-square-foot value of the lots, both appraisers applied a discount factor to account for a proposed bulk sale. To estimate the market value of the Business Park in a bulk sale, Witt reduced the estimated market value of the 30 lots by a bulk sales discount of 40%. The Witt Report stated, "[T]here is little market evidence involving arm's-length, non-distressed bulk sales of business parks such as the subject. However, there is considerable evidence on residential subdivision, which will be utilized as a part of this analysis."[14] Witt reported that the selected 23 sales from 1993 through 2009 showed a discount to aggregate retail sale price for the residential developments from a low of 13% to a high of 48.3%, with an average of 25.9%. But, the Witt Appraisal concluded that the comparison of the Business Park lots with the residential development sales caused an increase in the bulk sales discount to 40%. When this discount was applied to the aggregate retail estimated value of $12,585,000, the estimated value for the Business Park was $7,551,000.

The CBRE Appraisal applied a bulk sale discount of 65%. The report stated:

> Little data is available for bulk discount sales on developments similar to the subject. There have been residential bulk sales over the last 10-15 years. Although they indicate discounts from 20% to 60% they are not considered comparable to the subject. We have spoken with local brokers to obtain input on likely bulk discount estimates for the subject property. . . . Local brokers indicated that investors would demand discounts from 50% to 75% for a bulk purchase. We have estimated 65% for our analysis.[15]

---

[14] Exh. S, p. 17.

[15] Exh. 3, p. 32.

13

The Court finds CBRE's estimate of a 65% discount rate to be better supported than Witt's 40% estimate. As noted above, the Court questions the consideration of residential development sales, and finds consultation with local brokers to be more reliable. This leads the Court to conclude that the CBRE value of the Business Park using the sales comparison method is more reliable than the sales comparison estimate by Witt.

Both appraisers also estimated a market value for the 30 lots using the subdivision development or development income approach. There was testimony that this is the preferable method of appraisal, since an investor contemplating purchase of the Business Park would perform such an analysis. The starting point for this approach was the average lot value, determined as examined above. Then an income stream was projected based upon the "absorption rate," which is the predicted rate of sales of lots. Witt used an absorption rate of four-and-one-half years, projecting the sale of two lots in 2012, six lots in 2013, ten lots in 2014, and eighteen lots in 2015. The initial low rate was stated to be realistic based upon "the current state of the market with potential for some upside in the future."[16] The high rate of sales beginning in 2013 was explained as follows:

> [After mid-March 2013], it is my opinion that, given historical trends within the Kansas City metropolitan market and nationwide, overall absorption should increase, especially given certain economic factors within the subject market area. That is, the completion of the NNSA facility,[17] as well as the completion of Missouri 150 Highway improvements to

---

[16] Exh. S, p. 19.

[17] At trial, this was referred to as the "Honeywell facility."

14

> Missouri 291 Highway in Lee's Summit will certainly be
> beneficial to development growth within the subject area.
> Further, residential development within Leawood and southern
> Overland Park will continue, as well as newer developments,
> such as recent additional phases for Loch Lloyd to the south.[18]

Mr. Witt testified that the foregoing factors would provide synergy for development of the

Business Park, and that he was of the opinion that real estate development was presently in

the low point of the cycle and market conditions would soon improve. In addition, the Witt

Appraisal allocated increases in price of 1% per year during the first period, 2% through

March 2013, and then 4% per year. Expenses were deducted from the income stream. The

resulting net cash flow was just under $13,000,000. This amount was then discounted to

present value using discount rates of 15% in the first period and increasing to 25% during

the final period. Realtyrates.com and PwC (PricewaterhouseCoopers) Real Estate Investors

Survey were consulted when determining these rates. Then the report stated, "In analyzing

the subject as a real estate investment, I believe that discount rates in the 17.5% to 18%

range (annually) are reflective of the risk inherent to the subject as an investment."[19]

Rather than determining value using the discount rates shown in the cash flow calculations

(15% to 25%), an average discount rate of 17.5% to 18% was used. These rates were then

used as a basis for Witt's opinion that the overall value of the Business Park using the

development income approach was $7,355,000.[20]

---

[18] Ech. S, p. 19.

[19] Exh. S, p. 20.

[20] *See* Exh. S, pp. 20-21.

15

The CBRE Appraisal Report adopted an absorption rate of 10 years, with a projection of sales of two lots per year in the first two years, three lots per year for the next eight years, and four lots per year in years 9 and 10.  The basis for this position was stated as follows:

> Since there is little actual data available on the absorption rate of business park lots, we have relied on the opinions of local brokers that are active in the land market and are familiar with the subject property.  They indicated absorption periods from 10 to 20 years.  They indicated that there is a vast amount of land currently available on the market and a large square footage of improved properties available for sale and lease similar to those that have been and are likely to be built in the subject development.  They indicated that these properties would likely be absorbed at a significant discount before most owner-users or investors would build new similar improvements.  These brokers indicate that there is currently little activity in the business park/flex-user market.[21]

The CBRE Appraisal adopted a 2% per year growth in value and subtracted projected marketing and sales expenses, taxes, and general administrative expenses.  As to the discount rate, the CBRE Report, based upon the PwC Real Estate Investor Survey and realtyrates.com, found a discount rate of 25% to be appropriate.  When the cash flow analysis was completed using these assumptions, the CBRE Appraisal concluded that the estimated market value of the 30 lots based upon the discounted cash flow approach was $3,388,215.

---

[21] Exh. 3, p. 34.

16

The Court finds several weaknesses in Witt's discounted income approach valuation. First, for the reasons stated above concerning the comparable sales method, the Court finds that the Witt cash flow analysis began with an inflated value for the lots. Second, the Court finds the absorption rate of four-and-one-half years is not credible. It is inconsistent with the sales history of the Business Park. The Business Park was initially developed approximately 20 years ago. It had approximately 100 acres and 52 lots. At the time the bankruptcy was filed, 30 lots comprised of approximately 45 acres were owned by Debtor. There were only four completed sales from 2007 through 2011. To project, as does the Witt Appraisal, that all thirty lots will be sold in the next four-and-one-half years is not credible.

Third, when selecting an absorption rate, the Witt Appraisal relied heavily upon the opinion that nearby development, particularly along 135th Street, and the completion of the Honeywell facility,[22] would have a synergetic effect on development of the Business Park. This view of the absorption period fails to account for the fact that much of the recent development in the region of the Business Park is distressed. This results in an abundance of improved properties for sale or lease at prices significantly discounted from the costs which would be incurred to purchase a lot in the Business Park and construct improvements.

---

[22] As stated at n. 17, this is the facility the Witt Appraisal referred to as the "NNSA facility."

17

Fourth, Witt's four-and-a-half-year absorption rate implies that there will be a burst of activity in the Kansas City real estate market, or at least in the area of the Business Park, during the next four years. This position is refuted by the testimony of Bank's economist, John Keating, who testified that macro economic data indicates that the economy will not rebound from the recent recession as quickly as it has in the past. The Transaction Based Index (TBI) Provided by MIT,[23] on which Mr. Witt relied when testifying, shows an increase in real estate values during the first quarter of 2011, but does not attempt to project future growth. The Court finds the 10-year absorption rate used by CBRE to be better supported and much more compatible with the history of sales in the Business Park and the current Kansas City commercial real estate market.

The Court also questions Witt's selection of the discount rate of 17.5% to 18%. The selected rate is below the average rates reported in the two sources cited in the Witt Appraisal Report, realtyrates.com reporting rates from 16.42% to 31.2%, with an average for business parks of 23.34% and the PwC Real Estate Investor Survey reporting rates of 15% to 30% for the second quarter of 2011, with an average of 21%, with entitlements[24] in place, and higher if such entitlements are not in place.[25] Further, the Court cannot make sense of the Witt Appraisal Report's calculations applying the 17.5% to 18% discount rate, and these calculations were not explained at trial.

[23] Exhibit TT,

[24] At trial, the Court was informed that "entitlements" here refers to government assistance.

[25] Exh. BB, Bates-stamped p. CBRE000795.

18

At trial, Debtor's counsel relied upon three prior appraisal reports prepared and signed by CBRE, and all dated May 27, 2010, as supporting the correctness of the Witt Appraisal.[26] In particular, he relied upon the similarity of draft one of an appraisal prepared for Bank by CBRE dated May 27, 2010, which valued the Real Property at $6,735,000 (2010 First Draft),[27] to the Witt appraisal, which valued the Real Property at $7,700,000.[28] The 2010 First Draft was similar to the Witt Appraisal in that it estimated a high value ($650,000) for the agricultural land, a 5-year absorption rate, and a 20% discount rate for the income approach.

However, the Court rejects this similarity as grounds to enhance the credibility of the Witt Appraisal for several reasons. First, the 2010 First Draft was just that, a version which was later revised. Although the Court, like the Debtor, finds it puzzling that there would be three signed versions of appraisals prepared by CBRE and dated May 27, 2010, the unrefuted testimony presented by Bank was that the first two versions were drafts and only the final version was intended to be an accurate "as is" appraisal of the Real Property. The Final 2010 CBRE Appraisal[29] valued the Agricultural Land at $230,000, after the addition of adjustments to the prices of the comparables which were not in the 2010 First Draft. The Final 2010 CBRE Appraisal valued the Business Park at $3,860,000, based

---

[26] Exh. WW, XX, and U.

[27] Exh. WW.

[28] Exh. S.

[29] Exh. U.

upon a 10-year absorption period and a 25% discount rate for the income approach.
Second, the 2010 First Draft valued 9 lots for mutifamily use, a use which would have
required obtaining a use permit in Missouri and a zoning change in Kansas. Since the 2010
appraisal was to be "as is" based upon currently permitted uses, a valuation assuming
residential use was not appropriate. Residential use was not included in either the Witt
Appraisal or the 2011 CBRE Appraisal. The Court finds that these differences between the
2010 First Draft and the Final 2010 CBRE Appraisal make the 2010 First Draft unreliable.
Its similarity to the conclusions of the Witt Appraisal therefore do nothing to increase the
credibility of the Witt Appraisal.

      As the Court has noted, it finds the existence of what appear to be three final
appraisals for the identical date with significantly different values puzzling. But it also
finds the discrepancies between the 2010 First Draft (and the second draft of the same
appraisal) and the Final 2010 CBRE Appraisal insufficient to conclude the value
determined by the 2011 CBRE Appraisal is unreliable. The uncontradicted testimony was
that the two drafts were not the final conclusion of value in May 2010, and that the 2011
appraisal was developed completely independently of CBRE's prior valuations of the Real
Property. Further, the discrepancy between the $4,090,000 market value of 2010 final
appraisal report is somewhat, but not strikingly, higher than the 2011 market value of
$3,570,000. Other important elements of the final 2010 and the 2011 appraisals are not
wildly inconsistent. The value of the Agricultural Land changed from $230,000 to
$170,000, the per-square-foot value of the Business Park lots changed from between $5.75

20

and $6.50 to $5.50, and the absorption rate and the income-approach discount rate did not change.

The Court finds, unlike many occasions where the Court must determine value, this is not a situation where the Court should independently determine a value somewhere between the values offered by the parties. The valuation evidence was presented by two qualified experts, but this Court is not an expert appraiser. The calculations performed by the experts, particularly the discounted cash flow analysis applicable to the Business Park valuation, include many steps. If the Court were to determine one factor, such as the absorption rate or the discount rate, should be more than that used by Witt but lower than that used by CBRE (which it is not inclined to do), the resulting change in the value would not be something the Court has the expertise to calculate. And, as noted above, given the purpose of the valuation, a conservative value, such as that represented by the CBRE Appraisal, is appropriate.

**CONCLUSION.**

For the foregoing reasons, the Court concludes that the market value of Debtor's Real Property for purposes of plan confirmation is $3,570,000. Both the Witt and CBRE appraisals adopt the following definition of market value: "The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the

21

price is not affected by undue stimulus."[30]  The Court finds this to be an appropriate definition of value for the purpose of confirmation of Debtor's proposed plan, under which the Real Property would be distributed to Bank in partial or total satisfaction of the secured portion of its claim.  The Court emphasizes, however, that this valuation is only for the purpose of confirmation of Debtor's proposed plan.[31]

**IT IS SO ORDERED.**

# # #

---

[30] Exh. 3, p. 3; Exh. S., Addendum E, definitions, p. 1 (the definition in Exh. S does not begin with a capital letter and has a comma after "the buyer and seller" but is otherwise identical to the one in Exh. 3).  Implicit in this definition are the following conditions:  (1) Buyer and seller are typically motivated; (2) both parties are well informed or well advised, and acting in what they consider their own best interests; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in cash or financial arrangements comparable thereto; and (5) the price represents the normal consideration for a property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.  *Id.*

[31] The Court makes no finding whether this would be an appropriate value for confirmation of a sale following foreclosure in state court.