

**SO ORDERED.**

**SIGNED this 21st day of November, 2011.**

*Dale L. Somers*
_____
Dale L. Somers
United States Bankruptcy Judge

---

**For on-line use and print publication**
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

In re:

**CENTENNIAL PARK, LLC,**

                    **DEBTOR.**

**CASE NO.  11-22026**
**CHAPTER 11**

**MEMORANDUM OPINION DENYING DEBTOR'S**
**OBJECTION TO CLAIM OF FIRST NATIONAL BANK OF OMAHA**

On October 18 and 19, 2011,[1] the Court held an evidentiary hearing on Debtor's

Objection to Claim #5 of First National Bank of Omaha (FNBO or Bank),[2] in which

---

[1] Debtor appeared by Christopher J. Redmond and John J. Cruciani of Husch Blackwell, LLP. Creditor First National Bank of Omaha appeared by Jennifer K. Vath and Patrick Maxcy of SNR Denton US LLP.  Guarantor Dr. Bradley D. Vince appeared by Paul D. Sinclair and Brendan L. McPherson of Polsinelli Shughart PC.  There were no other appearances.

[2] Dkt. 66.  The hearing on the claim objection was combined with the hearing on valuation of Debtor's real property, the resolution of which has been addressed in a separate order.

Debtor Centennial Park, LLC (Debtor or Centennial Park), challenges Bank's entitlement to interest at the default rate and an award of attorney fees and costs. Since Debtor admits it defaulted on the Note giving rise to the claim and the Court finds Debtor's theories in support of its objection to parts of the claim are not persuasive, the Objection to Claim # 5 is denied.[3]

## BACKGROUND FACTS.

This is a single asset Chapter 11 case filed by Centennial Park, LLC, on July 4, 2011. Debtor's principal asset is Centennial Business Park (Business Park), a business park which straddles the Kansas-Missouri state line in the south Kansas City metropolitan area. Debtor acquired the property in 2006 for $6,988,028 cash,[4] financed by Intrust Bank, after the property was partially developed and some lots had been sold. The Intrust loan was refinanced by First National Bank of Kansas (FNBK) on May 7, 2008. Centennial Park executed an Amended and Restated Promissory Note (Note) in the principal amount of $9,716,600, evidencing the loan (Loan), and other Loan documents. FNBO became the owner of the Loan when it acquired FNBK by merger. For convenience, the Court will refer to the owner of the Loan as Bank, without distinction

---

[3] This Court has jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b) and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984. An objection to claim is a core proceeding which ths Court may hear and determine as provided in 28 U.S.C. § 157(b)(2)(B). There is no objection to venue or jurisdiction over the parties.

[4] Exh. 3 at 1.

between FNBK and FNBO.

The Note provides for a maturity date of April 10, 2011, but also requires the reduction of the principal balance by not less than $1,350,000 by April 10, 2010. Interest is due monthly, at a "prime rate" as defined in the Note (3.25%[5]) pre-default, and that prime rate plus 5.0%, or 8.25%, after maturity, by acceleration or otherwise. Under a Construction Loan Agreement executed the same day as the Note, the monthly interest payments, and other expenses, are to be disbursed from the proceeds of the Loan, so long as no event of default has occurred.

The Loan is secured by perfected liens on all property of Centennial Park, including the Business Park, and is personally guaranteed by Mr. Richard B. Sailors and Dr. Bradley D. Vince. Mr. Sailors and BP Centennial, LLC, are each 50% members of Centennial Park. Dr. Vince is the managing member of BP Centennial.

The Construction Loan Agreement provides for release of Business Park lots from Bank's lien as the lots are sold, with the application of 75% of the proceeds to the principal of the Note. During the two years after the May 7, 2008, execution of the Note, Centennial Park sold 4 lots for cash, resulting in $1,173,119.43 being paid to Bank. On March 31, 2010, an automated billing stating Centennial Park was to pay principal of $1,350,000 plus interest was generated by Bank and sent to Centennial Park. Conversations between representatives of Bank and Centennial Park ensued, but

_____

[5] Although the Note provides the interest rate will adjust daily, no change in the rate actually occurred during the relevant time.

3

resolution was not reached. On May 17, 2010, Bank declared the Loan in default for failure to pay $1,350,000 on or before April 10, 2010. The Loan was accelerated on June 1, 2010.

On August 6, 2010, Bank initiated an action in the District Court of Johnson County, Kansas, Case No. 10-CV-06988 (hereafter the "State Court Action"), seeking judgment on the Note, foreclosure of the liens on Debtor's real property located in Kansas, and judgment against the guarantors, Mr. Sailors and Dr. Vince. Following hearings on cross-motions for summary judgment, the State Court Judge on June 17, 2011, ruling from the bench, stated he would grant judgment against Centennial Park and the guarantors, and foreclosure of Bank's mortgage.

Centennial Park filed for relief under Chapter 11 on July 4, 2011, before a judgment was filed. On August 19, 2011, Bank filed its proof of claim.[6] On September 9, 2011, Debtor filed the objection to Bank's proof of claim (Objection), challenging Bank's entitlement to interest at the default rate and attorney fees.[7]

**OBJECTION TO AMOUNT OF BANK'S CLAIM.**

    **A. Positions of the Parties.**

Bank's proof of claim[8] is for $8,074,244.80, comprised of $7,239,654.14 of

---

[6] Claim # 5-1. An amended proof of claim, Claim # 5-2, was filed September 12, 2011, but neither the amount nor the elements of the claim were changed.

[7] Dkt. 66.

[8] Claim # 5-1.

principal, $711,519.04 of accrued interest, $1,659.087 of per diem interest after July 4, 2011, attorney fees and costs of $123,071.62, and additional attorney fees and costs.[9] Bank's interest calculation is summarized as follows.[10] Accrued interest was paid to March 10, 2010. From and including March 10, 2010, until but excluding June 1, 2010, interest was calculated daily based on the prime rate of 3.25% applied to the principal balance outstanding (that balance changed three times during this period). Beginning on June 1, 2010, the date of the acceleration letter, the rate was changed to the default rate of 8.25% and applied to the principal balance outstanding. The principal balance outstanding was reduced from $7,753,049.11 to $7,239,654.14 on June 16, 2010. As of July 4, 2011, the date the voluntary Chapter 11 petition was filed, the accrued interest was $711,519.04.

Debtor objects to portions of the claim and requests Bank's claim be reduced by: (1) $320,732.74, the alleged overstatement of interest for the period of April 10, 2010, to April 11, 2011, because, according to Debtor, Bank's claim is wrongly based in part upon the default interest rate; (2) $249,763.87, the interest at the pre-default rate from April 7, 2010, to the maturity date of April 11, 2011, because Bank allegedly waived its right to any interest by wrongfully rejecting a tender of interest on April 7, 2010; and (3) $123,071.62 for attorney fees and costs. According to Debtor, its total liability for interest is $141,022.43, calculated using the default rate from April 10, 2011 (the maturity

---

[9] Claim # 5-1, Attachment. The amended proof of claim did not change the amount of the claim.

[10] Exh. 19.

5

date), to July 4, 2011 (the date of filing).[11]

There are no disputes as to the interest provisions of the Note, the pre-default and the default interest rates,[12] the method of calculation of interest, or the applicable principal balances. As to interest, the objection is based upon the assertion that Bank "misinterpreted and misrepresented its Loan Documents" such that under Kansas case law, "the default and acceleration in 2010 were improper."[13] Also, according to Debtor, for the same reason, Bank should not be entitled to an award of fees for its enforcement of the Note in the State Court Action, or at least the fees should be limited to those for services directly related to the State Court Action.

### B. Findings of Fact.

The focus of Debtor's attempt to reduce the claim is the loan term which required a principal payment in the minimum amount of $1,350,000 on or before April 10, 2010.[14] On March 31, 2010, Bank sent Centennial Park an automated billing statement stating

---

[11] Dkt. 66 at 24-26 and 30-31. Debtor's calculation of the amount in item (1) appears on p. 26 and shows the amount to be $320,732.74, but when Debtor restates the amount on p. 31, it mistakenly states it is $320,786.30.

[12] The Note states the following with respect to increasing the interest rate:

> After the maturity of this Note, by acceleration or otherwise, the interest rate applicable hereto shall be five percentage points (5%) in excess of the Prime Rate (the "Default Rate"). . . . Additionally, upon the occurrence of an Event of Default, the interest rate applicable hereto shall be the Default Rate.

[13] Dkt. 66 at 16.

[14] Exh. A-2 at 2.

6

that Centennial Park was to pay $1,350,000, plus $22,148.42 in interest.[15]  Centennial

Park immediately contacted Bank.  Over the next few months, the guarantors, particularly

Dr. Vince, attempted to reach a global settlement to resolve Bank's concerns, but to no

avail.  The sale of one additional lot closed on April 23, 2010.  With the agreement of

Centennial Park and the guarantors, 100% of the net proceeds, rather than the 75% of net

proceeds provided for in the Loan documents, was applied to the Note, resulting in

payment of $167,531.49 to Bank on or about April 26, 2010.  At a meeting with Bank

officers on May 11, 2010, Dr. Vince offered to provide additional collateral for the Loan,

but no agreement was reached.  On May 17, 2010, counsel for Bank by letter addressed to

Centennial Park, the guarantors, and the guarantors' counsel, formally advised that the

Note was in default and Bank had a right to accelerate.  The letter stated in part:

> As you know, by the terms of the Note, a principal
> payment in the amount of $1,350,000.00 was due on or before
> April 10, 2010.  Lender informs us that such payment has not
> been paid and is delinquent.  Accordingly, Lender has the
> right to accelerate the Loan without further notice to you.
> Nevertheless, at this time it has not yet done so.  Should you
> not deliver a plan to Lender to cure this default on or before
> May 31, 2010, acceptable to Lender in its sole discretion,
> Lender will accelerate the Loan without further notice to
> you.[16]

A plan acceptable to Bank was not presented.  On June 1, 2010, Bank's counsel by letter

addressed to Centennial Park, the guarantors, and the guarantors' counsel, formally

---

[15] Dkt. 93, Joint Stipulation at 3.  A copy of the letter is included in the record as Exh. A-4.

[16] Exh. A-5.

advised that the Loan was accelerated.[17]  On June 16, 2010, Bank offset a CD pledged as collateral for the Loan, thereby applying $513,394.97 to the Loan obligation.  The State Court Action was filed on August 6, 2010.

Debtor presented evidence that Bank was concerned about the Loan before the March 31, 2010, billing statement was generated.[18]  The Loan was regarded as a problem loan in mid-2009.  Chris Willis, Bank's officer in charge of the Loan, "expressed 'anger' and 'agitation' with borrower's unwillingness to communicate key and material events and conditions adversely affecting the Business Park."[19]  Bank's evidence established that Centennial Park did not adhere to all of the non-monetary terms of the Loan.  Although Centennial Park was required to maintain its operating account at Bank, it did no do so.  Approval of Bank was required prior to disbursements to the guarantors, but the guarantors withdrew funds from the operating account without Bank's approval.

From March 31, 2010, the date Bank sent the automatic billing statement for $1,350,000 in principal, until sometime after the State Court's oral ruling in June 2011, Bank proceeded on the understanding that the Note and other Loan documents required a payment of $1,350,000 cash on or before June 10, 2010, even though the principal amount of the Loan had been reduced by the proceeds of lot sales.  Debtor presented no evidence that prior to September 17, 2010, it or the guarantors believed differently.  On

---

[17] Exh. A-6 at 2.

[18] Exh. YY.

[19] Exh. 20.

September 17, 2010, after the State Court Action had been filed, counsel for Dr. Vince (this attorney had been an addressee of both the May 17, 2010, default letter and the June 1, 2010, acceleration letter), in a letter to Bank's counsel,[20] took the position that if the Loan documents were properly construed, the proceeds of lot sales should be credited to the required principal payment, so that on April 10, 2010, only $176,880.69 was owed, and after the proceeds from the sale of the additional lot were applied on April 27, 2010, only $9,349.20 of the principal reduction remained due. Thus, according to counsel for Dr. Vince, as of April 26, 2010, approximately two weeks after the April 10, 2010, due date but before the May 17, 2010, written notice of default and the June 1, 2010, notice of acceleration, Bank had received all but $9,349.20 of the amount due. And, since Bank had billed for $1,350,000 in March 2010 and after the additional lot was sold in late April 2010 did not bill for $9,349.20, there was not proper notice of default or acceleration, and therefore no valid foreclosure action could be filed. A check for $9,349.20 was enclosed with the September 17, 2010, letter.[21] Bank received the check and applied the funds as a partial payment of accrued and unpaid interest.

In the State Court Action, Debtor and the guarantors urged this construction of the Loan documents. Bank continued to argue that a new $1,350,000 principal payment was

---

[20] Exh. A-11.

[21] Although the letter consistently used the figure $9,349.20 and the check was for that amount, in the State Court Action described below and in the parties' joint stipulation before this Court, the figure was reduced by twelve cents, to $9,349.08. This minor discrepancy has had no effect on the Court's decision, and the Court will use the stipulated figure in the rest of this opinion.

due on or before June 10, 2010.  The State Court adopted Debtor's position and orally held "the payments from the lot sales should be credited to the 1,350,000."[22]  In a written order applicable to Mr. Sailors, the State Court found the following as an uncontroverted fact, "By the terms of the admitted Loan Documents, the requirement for the minimum principal payments in the amount of $1,350,000 as set out in the Note does not require a separate additional payment, but a cumulative total of $1,350,000 of payments paid against the principal balance of the loan by April 10, 2010."[23]  But the State Court also found that Centennial Park had failed to pay the full principal payment in a minimum amount of $1,350,000 on or before April 10, 2010,[24] and that a balance of $176,880.57 in principal was due and unpaid on April 10, 2010.[25]  The State Court held that what happened after April 10, 2010, "didn't change the fact that there was a default as of that date"[26] and "the only question that the parties really contested here is whether or not under the circumstances the plaintiff should be entitled to accelerate."[27]  The State Court

---

[22] Exh. 9, Transcript of June 17, 2011, hearing in Case No. 10-CV-06988, District Court of Johnson County, Kansas, at 56.

[23] Exh. D, Order Denying Defendants' Motion for Summary Judgment and Granting Plaintiff's Motion for Summary Judgment Against Defendant Richard H. Sailors, Case No. 10-CV-06988, District Court of Johnson County, Kansas, filed October 14, 2011.

[24] Exh. 9 at 56.

[25] Exh. D at 6.

[26] Exh. 9 at 56.

[27] *Id.*

10

held that the Loan "clearly state[s]" Bank could accelerate[28] and rejected Debtor and the guarantors' defenses to Bank's claim for judgment on the Note, including interest at the default rate after June 1, 2010 (the acceleration date), and attorney fees and costs. Those rejected defenses, as stated in the order as to Mr. Sailors, included the following (which are substantially identical to those presented to this Court in the Objection): "[T]hat the failure to pay $9,349.09 [sic] or $176,880.57 was not a material breach; . . . that general principles of equity cannot and do not support acceleration of a $9.7 million dollar note with a year left to maturity for a $9,349.08 default; . . . [and] that a check for $9,349.08 tendered for the purpose of curing the $9,349.08 due cured any default."[29]

Before this Court, Bank does not continue to assert its prior position that the Loan documents required payment of a new $1,350,000 on or before June 10, 2010, but Bank does contend that Debtor was in default as of April 10, 2010, because the full $1,350,000 had not been paid. Bank also contends it is entitled to the interest and fees as stated in its proof of claim and as found by the State Court.

## C. Conclusions of Law.

**1. Because the State Court has not entered a judgment against Debtor, or even one of the guarantors, this Court is not required as a matter of law to adopt the State Court rulings on interest due and attorney fees to be paid.**

Before addressing the merits of Debtor's Objection, the Court considers whether

---

[28] *Id.*

[29] Exh. D at 9-10.

11

the following holdings of the State Court are controlling in this Court:  (1) that the Note was in default as of April 10, 2010; (2) that Bank properly accelerated the Note; (3) that Bank is entitled to a judgment for interest (at the pre-default rate until June 10, 2010, and at the default rate thereafter); and (4) that Debtor is liable for the requested attorney fees. Significantly, no written order or judgment has been entered against Debtor (since the stay of 11 U.S.C. § 362(a) bars such acts), no written order or judgment had been entered against guarantor Dr. Vince (since he was protected from such acts by an order of this Court until October 27, 2011), and a written order, but not a judgment, has been entered against Mr. Sailors, finding him liable on his guarantee of the Note, including for interest and attorney fees.

   If this Court were required to adopt the State Court findings, the Objection would be denied based upon those findings.  The Court therefore requested the parties to submit short briefs addressing the impact of the State Court findings on the Objection.  Debtor responded that the findings have no impact, since the absence of a judgment renders the doctrines of collateral estoppel and res judicata inapplicable.[30]  Bank responded that *Younger* abstention applies,[31] but did not move for abstention.

   The Supreme Court has held that "'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having

----

[30] Dkt. 98.

[31] Dkt. 95.

jurisdiction.'"[32] Preclusion of a second round of litigation by the closely-related doctrines of collateral estoppel or res judicata[33] requires a final judgment.[34] Likewise, the *Rooker-Feldman* doctrine, which precludes a lower federal court from exercising appellate jurisdiction over a state court judgment, applies only to final judgments.[35] The Court knows of no doctrine which precludes it as a matter of law from considering the same defenses which were decided by the State Court, but have not been entered in a final judgment by that court.

Bank argues that *Younger* abstention applies. But it is a very limited doctrine:

> *Younger* abstention dictates that federal courts not interfere with state court proceedings by granting equitable relief — such as injunctions of important state proceedings or declaratory judgments regarding constitutional issues in those proceedings — when such relief could adequately be sought before the state court.[36]

---

[32] *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 292 (2005) (*quoting McClellan v. Carland*, 217 U.S. 268, 282 (1910)).

[33] The Tenth Circuit has described the two doctrines as follows:

> "Under res judicata, 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.' Under collateral estoppel, 'once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.'"

*Clough v. Rush*, 959 F.2d 182, 186 -187 (10th Cir. 1992) (*quoting, with citations omitted, Sil-Flo, Inc., v. SFHC, Inc.*, 917 F.2d 1507, 1520 (10th Cir.1990)).

[34] 18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure: Jurisdiction and Related Matters, § 4432 (2d ed. 2002).

[35] *Exxon Mobil v. Saudi Basic Indus.*, 544 U.S. at 283-84.

[36] *Rienhardt v. Kelly*, 164 F.3d 1296, 1302 (10th Cir.1999).

This Court is not being asked to grant equitable relief which would interfere with the state court proceeding, so the conditions for *Younger* abstention are not present. But *Younger* is based upon comity, the "longstanding public policy against federal court interference with state court proceedings."[37]

It is this policy of comity[38] which gives the Court concern in this case. The issues raised by the Objection are in substance an appeal of the State Court's rulings, even though they have not been finalized by a judgment. This Court is reluctant to serve as an appellate court. But neither party has requested a stay of the bankruptcy case to allow a final adjudication by the State Court which would be binding on this Court, and this bankruptcy case cannot move forward without an adjudication of Bank's entitlement to the interest and attorney fees portions of its claim.

The result is that there is no reasonable alternative to this Court's reaching the merits of the Objection. Fortunately, independent review of the merits of Debtor's defenses to the interest and attorney fees claims convinces the Court that the State Court was correct, so there will be no inconsistent findings and the principle of comity will not be breached.

## 2. The Court rejects the grounds asserted by Debtor for its Objection to Bank's proof of claim.

The foundation of Debtor's Objection is the assertion the Loan documents should

---

[37] *Younger v. Harris*, 401 U.S. 37, 43 (1971).

[38] The authority of a bankruptcy court to refrain from hearing a case on grounds of comity is codified in 28 U.S.C. § 1334(c)(1).

be construed not to require a new principal payment of $1,350,000 on or before April 10, 2010. As previously noted, from this position, Debtor argues that the default and acceleration were improper, so that a majority of the interest and fees claimed should be disallowed. Centennial Park presents six overlapping arguments in support of its position. The Court finds none of them sufficient to sustain the Objection.

### a. The doctrine of substantial performance does not provide a basis to object to the claim.

First, Centennial Park relies on the doctrine of substantial performance. The Court is not convinced, notwithstanding general statements as to the wide applicability of the doctrine, that it applies to this controversy. The substantial performance doctrine applies to bilateral contracts for an exchange of performances.[39] Where one of the parties must perform first, that party's substantial performance is viewed as a condition precedent to the other's duty to render the return performance promised.[40] The doctrine "is intended to protect the right to compensation of those who have performed in all material and substantive particulars, so that their right to compensation may not be forfeited by reason of mere technical, inadvertent, or unimportant omissions or defects."[41] In this case, Debtor relies upon the doctrine to avoid payment of interest and fees clearly provided for by the Loan documents, not to protect a right to compensation or avoid a forfeiture.

---

[39] 15 Richard A. Lord, *Williston on Contracts*, ¶ 44:52 (4th ed.), available on Westlaw at WILLSTN-CN § 44:52 (database updated May 2011).

[40] *Id.*

[41] *Id.*

15

Centennial Park has not provided any cases applying the doctrine to invalidate a declaration of default based upon failure to timely pay principal unambiguously due under a note. The first case cited by Debtor, *Howarth*,[42] was an action to enforce a settlement agreement. It held that refusal of the plaintiff's attorney to accept the agreed settlement payment prevented the defendant's performance under the settlement agreement, that tender was substantial performance, and that the plaintiff and his attorney were therefore not excused from the confidentiality provisions of the settlement agreement. The second case cited by Debtor, *Almena State Bank*,[43] held the doctrine applied to mortgagors' alleged failure to provide financial information to a bank in accord with the mortgage agreement. The third case, *Barnett,*[44] concerned the cancellation of a life insurance policy. The Court's own research located no cases applying the doctrine in circumstances similar to this case. The Court therefore doubts that the Kansas Supreme Court would apply the doctrine as urged by Centennial Park.

Moreover, if the doctrine of substantial performance is applicable, its elements are not satisfied here. The Kansas case law relied upon by Debtor requires as one of the elements of substantial performance that "[t]he party made an honest endeavor in good faith to perform its part of the contract."[45] This element is not satisfied. The evidence

---

[42] *Howarth v. Olivier*, 30 Kan. App.2d 961, 52 P.3d 911(2002).

[43] *Almena State Bank v. Enfield*, 24 Kan. App.2d 834, 954 P.2d 724 (1998).

[44] *Barnett v. Life Insurance Investors Co. of Am.*, 293 F. Supp.2d 1220 (D. Kan. 2003).

[45] *Howarth*, 30 Kan. App.2d at 964, 52 P.3d at 914.

16

establishes that until September 2010, Debtor and the guarantors understood the Loan documents to require a new payment of $1,350,000. Although they negotiated with Bank as to acts which could be taken to avoid a declaration of default, they made no payments beyond giving Bank the proceeds of the sale of one lot. If one looks at the situation with hindsight, as does Debtor, and assumes that paying over the proceeds from the sales of lots should have been considered as partial performance, there is no evidence that Debtor made a good faith effort to fully perform, by paying the amount received from the lot sale, $167,531.49, before April 10, 2010, or even paying $9,349.08 after the proceeds of the sale of the lot were turned over but before acceleration. Negotiations with Bank were focused on a global settlement by providing additional collateral, not performance of the required principal payment.

### b. Debtor's failure to pay $1,350,000 by April 10, 2010, was a material breach.

Debtor's second contention is that the failure to pay $9,349.08 after April 27, 2010, was not a material default which warranted a declaration of default and acceleration of the Loan. As pointed out by Debtor, the Loan documents are contracts subject to the rules of contract construction. Under those rules, when the contracts are clear and unambiguous, they are enforced according to their terms.[46] In this case, the Loan documents provide that $1,350,000 principal is to be paid on or before April 10, 2010,

---

[46] *First Nat. Bank & Trust Co. v. Lygrisse*, 231 Kan. 595, 600-01, 647 P.2d 1268, 1272-73 (1982).

17

that the Note shall be in default "[i]f any payment of principal or interest is not made when the same becomes due and payable,"[47] and that if the Note is in default, "the holder hereof shall have the right, exercisable at such holder's discretion, to declare the entire unpaid principal amount and all accrued interest due hereunder immediately due and payable."[48]  The Loan documents do not give Debtor a right to cure a default.  It is uncontroverted that, even when the Loan documents are construed in the manner urged by Debtor, $176,880.57 was due and not paid by April 10, 2010.  The Loan documents leave no room for the argument that there was no default because the payments were *almost* those required by the Note.

The Court knows of no principal of law that payment of *almost* the amount due under a note is sufficient to avoid a declaration of default, when, as in this case, there is no right to cure and no waiver of strict compliance.  Rather, as the New York courts have held, the doctrine that a "default was insubstantial and *de minimis*" has "no applicability to measuring performance of the terms of commercial paper."[49]  The two cases cited by Debtor in support of the proposition that a "review of the amount/percentage paid (and not paid) is part of an appropriate analysis of substantial compliance"[50] are not helpful.  In

---

[47] Exh. A-2 at 3.

[48] *Id*. at 4.

[49] *Stream v. CBK Agronomics*, 79 Misc.2d 607, 609, 361 N.Y.S. 2d 110 (1974).

[50] Dkt. 98 at 3.

18

the first one, *Smith*,[51] the plaintiff sought the forfeiture of real property bought under a

contract for default in payment after eleven-twelfths of the purchase price had been paid.

*Carroll*,[52] the second case cited by Debtor, was an action for ejectment from real estate

where the court found the grantor had waived strict performance of the contract for sale.

This case involves only a default in payment of a promissory note; there is no issue of

forfeiture of property purchased under contract.

### c. Principles of equity will not be applied to relieve Debtor of its default.

Third, Debtor argues that general principles of equity cannot and do not support

the declaration of default, acceleration, and foreclosure in this case.[53] Debtor begins its

argument with the assertion that "[i]t is well settled under Kansas law that foreclosure

proceedings are equitable actions."[54] But this is not a foreclosure action; the Objection

addresses the amount due under the Note, nothing more. Quoting a Texas foreclosure

case, Debtor argues that "'a court in equity may relieve a debtor from the hardship of

acceleration based upon accident, mistake, fraud or inequitable conduct of the

creditor.'"[55] No Kansas cases adopting a similar position are cited, and the Court has

---

[51] *Smith v. Goodeagle Refining Co.*, 105 Kan. 148, 181 P. 552 (1919).

[52] *Carroll v. Naffziger*, 157 Kan. 482, 142 P.2d 818 (1943).

[53] Dkt. 66 at 19-22.

[54] *Id*. at 19.

[55] *Id*. (*quoting Vaughan v. Crown Plumbing & Sewer Service, Inc.*, 523 S.W.2d 72, 75 (Tex. App. 1975)).

19

found none.

One legal encyclopedia states the general rule to be as follows:

> In some circumstances, enforcement of an acceleration clause
> will be denied on equitable grounds. However, there must be
> circumstances to indicate that such relief is warranted, and it
> is only in rare cases that enforcement will be denied. Grounds
> for denial of enforcement include inequitable conduct,
> accident, mistake, or fraud. [56]

No Kansas cases are cited. However, under Kansas law, acceleration rights can be waived by conduct of the lender, such as repeatedly accepting late payments.[57] The Court will therefore assume, without deciding the question, that if the proper circumstances arose, a Kansas court would decline to enforce an acceleration clause based upon inequitable conduct of the creditor.

In this case, the Court finds no conduct sufficient to warrant the remedy sought by Debtor. The evidence presents a situation where Bank determined the Loan to be a problem loan and took actions to protect its right to recover on the Note and the collateral. There is no evidence of fraud or inequitable conduct. The evidence indicates good faith conduct by Bank. The Loan documents were construed by Bank to require a new payment of $1,350,000, and Debtor and the guarantors accepted this position until September 2010. The borrower and the guarantors are not unsophisticated consumers. The default and acceleration letters were sent to their counsel. It was not until after the

---

[56] 10 C.J.S. Bills and Notes, § 126, available on Westlaw at CJS BILLSNOTES § 129 (database updated Sept. 2011).

[57] *Foundation Property Inv., LLC, v. CTP, LLC*, 286 Kan. 597, 609, 186 P.3d 766, 774 (2008).

20

acceleration and the filing of suit that counsel for one of the guarantors took a position under which cure of the default would have been a realistic alternative for the borrower.

Despite the forgoing, the Court is sympathetic to Debtor's situation. Dr. Vince devoted himself to finding a solution. If Bank had initially construed the April 10, 2010, principle reduction clause as urged by Debtor, it is possible that maturity would have been delayed until April 10, 2011. Of particular importance is the fact that as of the meeting on May 11, 2010, when Dr. Vince met with Bank officers and offered additional collateral, and on May 17, 2010, when the notice of default letter was issued, only $9,349.08 of the $1,350,000 principal due on or before April 10, 2011, remained due, assuming the construction later adopted by Debtor. Although the Loan documents did not include a right to cure, Bank in the notice of default letter in essence offered such a right when it stated it would not accelerate the Loan if a plan to cure the default, acceptable to Bank in its sole discretion, was delivered to Bank on or before May 31, 2011. With the benefit of hindsight, from the point of view of Debtor and the guarantors, the acceleration appears unjust since there was a mutual mistake as to the cure amount. But Debtor has not convinced the Court that Bank was at fault; the evidence before the Court is that Bank acted in good faith and observed reasonable commercial standards.

Certainty in commercial loan transactions is necessary for a robust economy. The facts in this case are not so unjust as to support departure solely on equitable grounds from what all agree was the bargain of the parties as stated in the Loan documents.

### d.  Debtor did not deliver a plan to cure the default prior to May 31,

21

**2010, which Bank had no discretion to reject.**

As its fourth defense, Debtor argues that it presented a plan to cure the default prior to May 31, 2010, which Bank had no discretion to reject. This defense is based upon Dr. Vince's offer of additional collateral in May 2010 and Debtor's premise that only a $9,349.08 payment was required as of that date.

Of course, this was not the state of affairs in May 2010. Debtor, the guarantors, and Bank then understood that a new $1,350,000 was required to cure the default. The Note gave no right to cure, and the default letter offering an opportunity to cure expressly stated that acceptance of a proposed plan was at the sole discretion of Bank. There is no evidence that Bank acted other than in good faith when rejecting the offer of additional collateral. There was no proposed cure plan which Bank was obligated to accept.

### e. The check for $9,349.08 tendered for the purpose of curing the $9,349.08 due did not cure any default.

Debtor argues that the default in payment was cured by Bank's acceptance of a $9,349.08 check sent to Bank by counsel for Dr. Vince with the September 17, 2010, letter. Debtor argues that acceptance constituted a waiver of the claim that more than $9,349.08 was due.

Bank points out that the payment was made after the Loan had been properly accelerated, when the full amount of the principle and accrued interest was due. It cites *Postal Savings*[58] for the proposition that under Kansas law, absent evidence from which

---

[58] *Postal Sav. & Loan Ass'n v. Freel*, 10 Kan. App.2d 286, 288, 698 P.2d 382, 384 (1984).

22

intentional waiver can be inferred, acceptance after acceleration of less than what is owed

is not a waiver of the right to accelerate.  In addition, Bank directs the Court to the Note

which provides for acceptance of payments without waiver, stating as follows:

> Borrower agrees not to send Bank payments marked "paid in
> full," "without recourse," or similar language.  If Borrower
> sends such a payment, Bank may accept it without losing any
> of Bank's rights under this Note or any other Loan Document,
> and Borrower will remain obligated to pay any further amount
> now, or in the future, owed to Bank under this Note or any
> other Loan Document.[59]

The Court finds Bank's arguments persuasive.  The acceptance of the $9,349.08

payment after acceleration did not waive Bank's right to accelerate.

### f.  Bank did not materially breach the Loan documents by failing to fund the April 2010 interest payment.

Finally, Debtor argues that Bank's failure to fund the April 2010 interest payment

was a material breach which resulted in Bank's waiver of the right to recover interest until

the maturity of the Loan on April 10, 2011.  Under the Loan documents, interest payments

are to be made by draws on the Loan.  This procedure was followed prior to April 2010,

when Bank did not fund the interest stated to be due on the March 31, 2010, billing

statement.

Bank responds that its failure to fund the interest due in April 2010 was not a

breach of the Loan since funding was excused by the prior default of Centennial Park.

The Construction Loan Agreement provides that as long as no event of default has

---

[59] Exh. A-2 at 2.

occurred, Bank "shall automatically make disbursements from the proceeds of the Loan to fund interest payments" and Bank "shall have the right to refuse, or discontinue disbursement . . . if (i) Borrower or any Guarantor defaults."[60]  Not only was there a payment default as of April 10, 2010, but the evidence established additional defaults had occurred.  Section 1.4 of the Loan Agreement[61] provides that without prior written consent so long as the Loan is outstanding, no funds of Centennial Park shall be used to make any distribution to Centennial Park or the guarantors.  Such disbursements were made.  Section 5.16 of the Loan Agreement[62] requires Centennial Park to maintain its operating account with Bank.  It did not do so.  Since these defaults suffice to resolve the issue, the Court does not address additional defaults alleged by Bank.

The Court therefore concludes that Bank had no obligation to advance Loan proceeds for the payment of the interest due in April 2010, and failure to do so does not provide a defense to the payment of interest prior to April 2011.

### g.  Bank is entitled to include the requested attorney fees and costs in its claim.

Debtor challenges the attorney fees and costs portion of Bank's claim on two grounds:  (1) Because the acceleration of the Note was unjustified, no fees should be awarded; and (2) some of the requested fees are for services not within the scope of the

---

[60] Exh. A-3 at 14-15.

[61] *Id*. at 2.

[62] *Id*. at 26.

24

State Court Action. As discussed above, the Court has found the Note was properly accelerated, so the objection to the attorney fees portion of the claim on this basis is denied.

The factual basis for the Objection to a portion of the attorney fees claim is the following. The total fee claim filed is $123,071.62, comprised of fees from the law firm of Levy & Craig, which initially represented Bank, and SNR Denton US LLP, the firm which took over representation in late October 2010. Debtor contends that: (1) $16,183 of the Levy & Craig fees and $8,000 of the SNR Denton fees should be disallowed because they involve a claim against Bank's title insurer regarding a defective legal description in the deed of trust of Debtor's Missouri property; (2) $3,468 of the SNR Denton fees and $5,697 of the Levy & Craig fees are for matters outside the scope of the State Court Action, such as research on recovery of transfers between spouses and prejudgment attachment, matters which relate to recovery from the guarantors; and (3) as much as $29,259.50 of SNR Denton fees are devoted to third party discovery of non-monetary defaults, which the State Court found not relevant to the summary judgment proceedings.

Debtor's Objection to the claim for fees implicitly construes Bank's right to fees as limited to those fees necessary to the resolution of the State Court Action. Debtor cites no legal basis for this position.

Bank's claim for fees is based upon the Loan documents, which Debtor in its arguments does not even acknowledge. The Note provides for the recovery of reasonable attorney fees, as follows:

25

If this Note shall be placed in the hands of attorneys for interpretation, negotiation, enforcement or collection, whether with respect to any bankruptcy type proceeding or otherwise, the undersigned further promises to pay, to the extent not prohibited by applicable law, all costs and expenses of collection, including reasonable attorneys' fees, costs and expenses, even if not taxable or assessable as court costs."[63]

The Loan Agreement provides an even more detailed, all-encompassing paragraph by which Debtor agreed to be liable for attorney fees:

It is understood and agreed that Lender will employ attorneys in connection with the preparation, interpretation, negotiation and enforcement . . . of this Agreement, the Loan Documents and the Loan herein referred to and all matters in connection herewith, or to commence, defend or intervene, file a petition, complaint, answer, motion or other pleadings, or to take any action in or with respect to any suit or proceeding . . . relating to this Agreement, or any other Loan Document, or to enforce any rights of Lender hereunder or thereunder, whether before or after the occurrence of any Event of Default, then in any of such events, all of the reasonable attorneys' fees arising from such services, and any expenses, costs and charges relating thereto, shall to the extent allowed by law be payable on demand.[64]

Bank's argument in response to the Objection is that all of the requested fees are within the scope of Debtor's agreement to be liable for fees. The Court agrees. The litigation against the title company relates to the deed of trust, a Loan document. Legal fees incurred with respect to enforcement of the guarantees are fees relating to collection of the Loan and enforcement of Bank's rights under the Loan documents. As this Court

---

[63] Exh. A-2 at 5.

[64] Exh. A-3 at 21-22.

26

has recognized above, the non-monetary defaults are relevant to Bank's claim against Debtor.

The Court therefore denies the Objection to the claim for attorney fees and costs.

**CONCLUSION.**

For the foregoing reason, the Court denies Debtor's Objection to the claim of Bank. There is no question that the Note was in default after April 10, 2010. Bank's entitlement to the interest and fees as stated in Claim #5 is in accord with the Note and other Loan documents. The Court rejects Debtor's reliance upon numerous legal and equitable principles to defeat this entitlement.

The Objection to the proof of claim of First National Bank of Omaha is denied.

**IT IS SO ORDERED.**

# # #

27